[No. B190508. Second Dist., Div. Five. Aug. 20, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR ARTURO MARTINEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion, part C.

**COUNSEL**

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MOSK, J.—**

## INTRODUCTION

After defendant and appellant Victor Arturo Martinez (defendant) engaged in a physical altercation with two clerks at a convenience store, he left the scene but returned shortly and again began to fight with them in the parking lot of the store. After being struck repeatedly with a wooden dowel wielded by one of the clerks, defendant, bleeding from a gash on his forehead, pulled a knife out of his pocket. He proceeded to disarm and stab the dowel-wielding clerk, and then fatally wound him in the neck with the knife.

The jury in defendant's second trial[1] found him guilty of second degree murder. On appeal, defendant contends that the trial court violated his constitutional rights by admitting the preliminary hearing testimony of the surviving clerk without the prosecution having exercised due diligence in attempting to obtain the presence of that clerk to testify at trial. Defendant further contends that the evidence was insufficient to support the second degree murder conviction; the trial court erroneously instructed the jury because the predicate unlawful act was not defined for finding implied malice; and the trial court misstated the requisite intent for voluntary manslaughter.

In the published portion of this opinion, we hold that the prosecution used reasonable diligence in attempting to obtain the presence of the clerk as a witness, and therefore the trial court did not err in admitting the preliminary hearing testimony of that clerk; the trial court properly defined the requisite unlawful act for second degree murder and properly categorized in its instruction the different types of intent for voluntary manslaughter; and any arguable instructional error concerning the requisite intent for manslaughter was not prejudicial. In the unpublished part of this opinion, we hold there is substantial evidence to support the conviction for second degree murder. We therefore affirm the judgment.

## FACTUAL BACKGROUND

Defendant, who worked as a handyman at George Medina's residence, lived in a toolshed behind that residence. Medina's residence is located

---

[1] The jury in defendant's first trial deadlocked, and the trial court declared a mistrial.

directly across the street from the California Mart, a convenience store. About a week prior to the incident in question, defendant told Medina that he had been ejected from the California Mart. Defendant was "upset" about the incident and said, "I'm gonna kill the guy." At that time, defendant had been drinking all day and was drinking "straight Jack Daniels" from the bottle. Medina said he had never seen anyone drink like that before.

On September 24, 2004, Inderjit Singh (Singh) was working with his uncle Ajmer Gill, the murder victim (the decedent), at the California Mart.[2] Singh had had problems with defendant in that store previously. Defendant had used "bad language" and had told Singh, "Go back to your country, you Arabs." On the evening of September 24, defendant was carrying a six-pack of beer from the refrigerated area towards the checkout counter of the store when a can of beer from the six-pack dropped to the floor. Defendant picked up the can and retrieved another six-pack of beer, but a can dropped out of that six-pack as well.

According to Singh, he tried to help defendant put the beer back in the six-pack, but defendant began using "bad, bad, bad words" like " 'you're Pakistanis.' 'You go back to your country.' 'Why are you here.' " Defendant also said things like " 'F--- you' . . . . 'You are Osama Bin Ladin [sic].' " At some point, the decedent joined in the altercation. The decedent pushed defendant, who was using profanity directed at Singh and the decedent, saying, " 'Your mother this.' And 'your sister that.' " Defendant threw a punch at the decedent and started fighting with Singh and the decedent as they tried to remove defendant from the store. On the way out of the store, defendant tripped and fell into a "chip stand" and onto the ground. Defendant got up and exited the store. Steve Gonzales, a regular California Mart customer, was inside the store during this initial altercation with defendant, and he saw or overheard portions of it.

Singh, the decedent, and defendant continued to argue outside the store in the parking lot. Singh and the decedent then physically pulled defendant back inside the store. Singh did not know why the decedent wanted to force defendant back into the store. At some point, they "just let go of him."

---

[2] The California Mart had security cameras from which the prosecution compiled a videotape of portions of the events of September 24. The videotape shows a view of the refrigerated area of the store where the first altercation began. It also shows separate views of the checkout counter and the exterior of the entrance to the store, including the sidewalk in front of the store and part of the parking lot where the second and fatal altercation occurred. Several eyewitnesses were questioned about various portions of the events depicted on the videotape, and provided their interpretations of what was being shown on the videotape as it was being played for the jury.

Defendant stood at the door using "bad language," and challenged Singh and the decedent to come outside and fight. Defendant was "very angry," wanted to fight with them, and threatened them, saying, "I'll do this and I will do that." Gonzales saw defendant point his finger at Singh and the decedent and say something to the effect of, "I know you and who you are and where you live."

The decedent came out of the store again, this time with a stick or wooden dowel[3] in his hand, and Singh followed him.[4] According to Singh, the decedent did not hit defendant with the wooden dowel, and was only trying to chase defendant away. Defendant left the scene, and Singh and the decedent returned to the store and resumed their work. According to Singh, "everything was calm."

About eight or nine minutes later, defendant came back to the store. The videotape shows defendant at the entrance to the store touching the outside of his front pants pocket with his right hand.[5] According to Singh, defendant stood at the door and "wanted to fight again"; he said "the same things" and used the same "bad language." The decedent was standing behind the checkout counter at the cash register. Defendant said, " 'Mother F and sister F' and 'I'll do this to you and that to you.' " Maria Sandoval was inside the store at the time and heard the loud voices and cursing. She heard defendant yell, "Come outside, motherf-----. Puto. Son-of-a-bitch." She saw a young man who worked at the store, presumably Singh, go outside. Defendant and the young man began to fight just outside the door. She saw the young man on the bottom, looking up, and defendant was on top of him.[6]

The videotape shows the decedent behind the checkout counter as he retrieved something from below the counter and then hurriedly exited the store. The videotape taken from the exterior of the entrance to the store shows the decedent exit the store, armed with a wooden dowel, and swing it repeatedly at defendant.

Sandoval, who had left the store when the second altercation began, did not see the decedent hitting defendant with the wooden dowel, but the

---

[3] The police recovered what they described as a "wooden dowel" from the parking lot of the pizza parlor across the street from the California Mart. Witnesses described seeing a "stick" in the decedent's hand.

[4] Singh did not see the wooden dowel in the decedent's hand at that point, but the videotape clearly shows it.

[5] The videotape also shows that after the first altercation, defendant's shirt was badly torn, but that, upon his return, he was wearing a shirt that was intact.

[6] The videotape does not show this portion of the second altercation.

videotape clearly shows the decedent doing so. She saw the decedent and defendant fighting for control of a wooden "stick."

Roderick Todd and his brother-in-law, Jose Blanco, had just left a Chinese restaurant near the California Mart. Todd, who was on his way from the restaurant to the store, saw a fight in the store parking lot about 17 feet away from him. He saw the decedent hitting defendant repeatedly with a "stick," including a blow to the head. He noticed that defendant was bleeding from his head and that when defendant realized he was bleeding, he became enraged. According to Todd, defendant took the "stick" away from the decedent and hit the decedent with it.

Blanco saw the decedent taking full swings with a "stick," hitting defendant repeatedly and observed defendant bleeding. Blanco said defendant somehow gained control of the "stick" but did not see how it happened. He then saw defendant hitting the decedent with the "stick."

Todd saw the decedent raise his hands up, and heard him yell, "Stop, stop, stop." It appeared to Todd that the decedent was "defenseless." As the decedent was backing away, defendant kept swinging the "stick" at him.

Blanco saw defendant with something else in his other hand that resembled a long, sharp stick. Defendant then had a "stick" in one hand and something else in the other. He was swinging "kind of crazy" at the decedent with both hands.

Sandoval saw defendant and the decedent both holding the "stick," and then defendant gained control of it. She next saw defendant stab the decedent with a pocket knife "three or four times." She heard a man in a white hat, who appeared to be defendant's companion, tell defendant to leave.

During the second altercation in the parking lot, the videotape shows defendant remove what appears to be a knife from his front right pants pocket with his right hand and swing at the decedent's left side. After defendant stabbed the decedent in the left side, a man in a white cap, presumably the man Sandoval had described as defendant's companion, tried to grab or restrain defendant's right hand, as if trying to stop defendant from stabbing the decedent again. Defendant appeared to hesitate as the decedent backed toward the entrance of the store, and then swung the knife towards the left side of the decedent's neck, striking just below the ear.

Todd saw the decedent grab his neck and sit on the ground. Blanco saw the decedent grab his neck and "[back] off out of the situation," but he was "still getting hit while he was holding himself." Blanco also saw the decedent go

down. Then defendant and his companion looked in Blanco's direction and ran across the street to the pizza parlor. Sandoval heard defendant say, "Let's go. This one is already dead" or "this one is already f----- up." Then she saw defendant leave with the wooden "stick" in his hand, along with his companion, and cross the street to the pizza parlor.

The decedent was pronounced dead that evening. He died from a stab wound to the left side of his neck, just below the ear, that damaged both his carotid artery and jugular vein. In addition to the wound to his neck, the decedent had a nonfatal, "long cut in the right lateral chest," underneath the arm, a nonfatal stab wound to the left side of his chest that fractured a rib, and contusions and abrasions to both arms that were described as defensive wounds.

Salvador Medina resided with his brother, George Medina. Shortly after the stabbing, Salvador Medina saw defendant enter the gate of the Medina residence and jog to the shed in the back. Salvador Medina saw a cut on defendant's forehead and blood on his clothes. Defendant appeared to have been drinking. Salvador Medina alerted police officers—who were "standing outside [George Medina's] house looking for [defendant]"—to defendant's location. As the officers approached defendant, he ran and tried to scale the backyard fence.

Los Angeles police officers arrested defendant at approximately 10:45 p.m. and took him to the police station. He had abrasions on his wrists, a cut on his forehead, and redness on his back. Defendant had an odor of alcohol on his breath, his speech was hesitant, and his eyes were bloodshot and watery. Defendant was given a breath-alcohol test at approximately 6:00 a.m. on September 25. The printout from the Intoxilyzer machine used to perform the test showed blood-alcohol readings of .13 at 6:04 a.m. and .14 at 6:07 a.m. Defendant's expert opined that, assuming a person did not drink any alcohol from 10:45 p.m. (i.e., the time of defendant's arrest) until 6:00 a.m. (i.e., the time of the test), that person's blood-alcohol level around 9:00 p.m. on the night before the test—the time of the incident—would have been .27. The expert further gave his opinion that a person weighing around 165 pounds would be "drunk" with a blood-alcohol level of .27.

About 11:45 p.m. on the evening of September 24, Los Angeles Police Detective Jose Martinez arrived on scene at the California Mart. Near the Medina residence, he recovered a knife with a serrated edge, but it was never connected to the stabbing of the decedent. A wooden dowel was also

recovered from the parking lot of the pizza parlor across the street from the California Mart.

## PROCEDURAL BACKGROUND

The Los Angeles County District Attorney charged defendant in a one-count information with murder in violation of Penal Code section 187, subdivision (a).[7] The information alleged that in the commission of the charged offense, defendant used a deadly and dangerous weapon, a knife, within the meaning of section 12022, subdivision (b)(1), causing the offense to be a serious felony within the meaning of section 1192.7, subdivision (c)(23). The information contained an allegation pursuant to sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i), that defendant had suffered a prior strike felony conviction in *People v. Martinez* (Super. Ct. L.A. County, 2005, No. LA038386) for violation of section 288, subdivision (a) (lewd act with a minor under the age of 14),[8] and that under section 667, subdivision (a)(1) defendant had suffered a prior conviction of a serious felony in case No. LA038386 for the same violation of section 288, subdivision (a) as alleged in the information for the prior strike.

Defendant was arraigned, pleaded not guilty, and denied the special allegations. On November 10, 2005, during defendant's first jury trial, the trial court held an Evidence Code section 402 hearing,[9] during which there was testimony from two prosecution investigators concerning their efforts to obtain Singh's presence at trial to testify. The transcript of that hearing[10] reflects that the trial court admitted Singh's preliminary hearing testimony at

---

[7] All further statutory references are to the Penal Code unless otherwise stated.

[8] At the time defendant was arrested in this case, defendant's formal supervised probation in case No. LA038386 had been revoked and a bench warrant had been issued for his arrest in that case.

[9] Evidence Code section 402 provides: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. [¶] (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

[10] Neither party included the transcript of the Evidence Code section 402 hearing on November 10, 2005, in their respective designations of the record on appeal. (See Cal. Rules of Court, rule 8.120(a)(5).) It was, however, a court exhibit at the March 16, 2006, section 402 hearing, and both parties requested that the trial court transmit that exhibit, along with certain others, to this court pursuant to what is now California Rules of Court, rule 8.224(a).

the first trial because he was unavailable, and there was sufficient evidence of the prosecution's diligence in attempting to procure Singh's presence at the trial as a witness. On November 16, 2005, the jury in the first trial deadlocked. As a result, the trial court declared a mistrial. After dismissing the jury, the trial court found defendant to be in violation of his probation in case No. LA038386, and indicated that defendant would be sentenced in that case following the retrial in the instant case. Prior to the retrial, however, the trial court decided to sentence defendant in case No. LA038386. The trial court sentenced defendant to the mid-term of six years.

On March 16, 2006, the second jury trial commenced, with the prior felony conviction issue bifurcated. The trial court held a second Evidence Code section 402 hearing, found the prosecution had exercised due diligence in attempting to have Singh testify at the trial, and again ruled that the preliminary hearing testimony of Singh was admissible because of his unavailability.

On March 24, 2006, the jury returned its verdict finding defendant guilty of second degree murder. The jury also found the allegation that defendant used a knife within the meaning of section 12022, subdivision (b)(1) to be true.

On March 30, 2006, the trial court held a bench trial on the prior conviction allegation and found the allegation to be true within the meaning of sections 667.5, subdivision (c) and 1192.7, subdivision (c). The trial court also found the prior conviction allegation to be true within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i).

The trial court sentenced defendant to a base term of 15 years to life, doubled to 30 years to life based on the prior strike conviction, to run consecutively to his six-year sentence in case No. LA038386. Pursuant to section 12022, subdivision (b)(1), the trial court sentenced defendant to an additional and consecutive one-year sentence. Pursuant to section 667, subdivision (a)(1), the trial court sentenced defendant to an additional and consecutive sentence of five years, for a total sentence of 36 years to life.

## DISCUSSION

### A. *Standards of Review*

We review de novo the issue of whether the prosecution, in using the preliminary hearing testimony of Singh, satisfied the due diligence requirement in attempting to produce him at trial, so as to justify an exception to defendant's constitutionally guaranteed right of confrontation at trial.

(*People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*); *People v. Smith* (2003) 30 Cal.4th 581, 610 [134 Cal.Rptr.2d 1, 68 P.3d 302] ["When . . . the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially"].) Defendant's challenge to the propriety of certain of the trial court's jury instructions raises an issue of law that we review de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551, 82 P.3d 755].) "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law . . . ." (*Ibid.*)

### B. *Permitting the Reading of the Preliminary Hearing Transcript at Trial Did Not Violate Defendant's Rights*

Defendant contends that the trial court violated his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution when it allowed Singh's preliminary hearing transcript to be read to the jury during the second trial. Defendant argues that the prosecution's evidence did not establish the necessary due diligence in connection with its efforts to obtain Singh's presence at trial to testify.

 "The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. [Citations.] That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. [Citations.] California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness. [Citation.]" (*Cromer, supra*, 24 Cal.4th at p. 892.)[11]

Singh testified at the preliminary hearing on January 15, 2005. During the first jury trial, the trial court held an Evidence Code section 402 hearing on November 10, 2005, to determine whether to admit Singh's preliminary hearing testimony because he was unavailable to testify at trial. The prosecutor called Craig Ratliff, a senior investigator for the Los Angeles County District Attorney's Office. Ratliff testified that he was assigned to locate Singh on July 11, 2005. He located Singh in Montreal, Canada. Singh was not a citizen of either Canada or the United States. In an effort to obtain

---

[11] Evidence Code section 240 requires a proponent of evidence to demonstrate the unavailability of the witness with a showing that the proponent "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code § 240, subd. (a)(5); see fn. 12, *post*.)

Singh's presence in court to testify at trial, Ratliff initially filled out "protocol documents" and submitted them to "Homeland Security in Washington, D.C." In return, he received a document from the "U.S. Immigration and Customs Service" (presumably United States Immigration and Customs Enforcement—part of the United States Dept. of Homeland Security) dated August 5, 2005, entitled "Mandatory Tracking Requirements." It was the form that Ratliff would present to custom agents if and when he brought Singh into the United States at the Los Angeles International Airport.

Before the appropriate form could be issued to him, Ratliff had to contact Singh, which he did. He also had to request that a deputy district attorney write a letter stating why the witness was needed for trial, which he also did. The letter from the deputy district attorney was dated July 11, 2005, and was submitted along with the application to the Federal Bureau of Investigation office in downtown Los Angeles, where it was received and "signed by the Chief of the Bureau." The documents were then faxed to "Homeland Security in Washington, D.C."

The "Mandatory Tracking Requirements" document dated August 5, 2005, indicated that Singh would be allowed to enter the United States within 15 days of that date. When the case was continued, however, Ratliff received a notice that the permission for Singh to enter and stay in the United States (referred to as "the parole") had expired and was terminated effective September 3, 2005.

On September 30, 2005, Ratliff "faxed documents back there and began the procedure to renew that parole." He made arrangements with an agent from the Los Angeles office of "Bureau of Immigration and Customs Enforcement" for preparing a set of the same documents that would be updated. He did not receive those documents, however, because he was "transferred out of the assignment." He gave the file to Senior Investigator Robert Williams.

Williams was assigned the Singh file on October 24, 2005. He conferred with Ratliff about what had already been done to attempt to ensure Singh's presence in court to testify at trial. Williams then made travel arrangements through a "witness assistant . . . at San Fernando Valley branch," for November 3, 2005.

After making those arrangements, Williams was put in touch with a Los Angeles Police Department officer who spoke Punjabi. He gave that officer the specifics of Singh's travel arrangements and asked him to telephone Singh and relate that information to him. The officer telephoned Singh and was informed that Singh had applied for asylum in Canada and that Canadian officials had taken Singh's "Indian citizenship documents."

Williams then telephoned John Choi, who worked for the "Canadian Consulate [*sic*] General in Los Angeles." Choi informed Williams that there was nothing preventing Singh from leaving Canada—because Canada has no "exit controls"—but that if he did leave, he would be deemed to have abandoned his "refugee status." Thus, there was no assurance that Singh would be allowed to reenter Canada.

On November 1, 2005, Williams spoke with Singh by telephone, through Singh's own Punjabi interpreter. Singh's interpreter told Williams that Singh had a Canadian attorney who was handling his asylum proceedings in Canada, and that if Singh were to come to the United States to testify, he would not only be in the United States illegally, but if he returned to Canada, he would also be in Canada illegally.

Williams next contacted Sher Gill, the decedent's brother, who knew Singh. Gill said he had spoken to Singh, who said he could not leave Canada.

After speaking to Choi in the Canadian Consulate in Los Angeles, Williams made "a flurry of phone calls all over Canada" and ultimately spoke to Dick Graham, the Director of Asylum Division Refugee Branch, Citizenship and Immigration Canada in Ottawa, Ontario. Graham confirmed that if Singh left Canada, Singh would be deemed to have abandoned his asylum request and it would be difficult for him to obtain permission to return to Canada because the necessary visa application would be viewed "unfavorably." He also informed Williams that there were no special arrangements between the United States and Canada covering Singh's circumstance. Singh, through his interpreter, told Williams that the interpreter would call Williams back with the name and telephone number of Singh's Canadian Punjabi-speaking attorney, but the interpreter did not do so.

After hearing this evidence and considering the exhibits, the trial court, on November 10, 2005, found that "the People have done everything they possibly could have done to secure the witness['s] presence." The trial court therefore concluded that "the fact that Canada could not guarantee that [Singh] would be given asylum, the fact of the likelihood that [Singh] may be barred from returning to Canada, and consequently, would have been a stateless person, is sufficient to show that [Singh] is unavailable under the auspices of Evidence Code section 240."[12]

---

[12] Evidence Code section 240, subdivision (a) provides: "(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is any of the following: [¶] (1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant. [¶] (2) Disqualified from testifying to the matter. [¶] (3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity. [¶] (4) Absent from the hearing and the court is unable to compel

At the March 16, 2006, Evidence Code section 402 hearing before defendant's second trial, Williams was again called to testify about his efforts to procure Singh's presence at the second trial to testify. Williams testified that after he was assigned to investigate the case the first time, he was asked again around November 16, 2005, to look into the status of Singh.

Williams determined that Singh's status had not changed—he was still a refugee in Canada. He said, according to Choi, it was likely Singh would not be allowed back into Canada because he had no passport or other documents. Williams sent a letter to Singh in Montreal on February 21, 2006, explaining that the prosecution wanted him to travel to the United States to testify. Williams's letter informed Singh that the prosecution would pay Singh's travel expenses, and Williams said he was sure Singh understood that. Williams followed up his letter to Singh with two telephone calls, but Singh was working an evening shift, making it difficult to contact him. Williams finally spoke to Singh on March 9, 2006. Singh informed Williams that he could not testify at trial because he was seeking asylum in Canada, had no passport, and would not be allowed to return to Canada if he left. According to Singh, there was a hearing scheduled in Canada on his asylum claim on the same day as the Evidence Code section 402 hearing in defendant's second trial—March 16, 2006.

After hearing argument, the trial court again found that Singh was unavailable, noting that "[n]othing has changed." The trial court also found that the prosecution had exercised due diligence in attempting to obtain Singh's presence at trial, and that defendant's Sixth Amendment right to confrontation would not be violated by allowing Singh's preliminary hearing testimony to be read to the jury because that testimony had been subject to cross-examination. Accordingly, the trial court ruled that it would allow the preliminary hearing transcript to be read to the jury.

Defendant contends that the prosecution failed to establish due diligence in producing Singh for the trial. Relying primarily on *Cromer, supra,* 24 Cal.4th 889, defendant argues that the prosecution unreasonably delayed in trying to contact Singh, and thereafter made inadequate attempts with the Canadian authorities to arrange for his return to Canada after testifying. (*Id.* at p. 892.)

In *Cromer, supra,* 24 Cal.4th 889, the prosecution's primary witness testified at the preliminary hearing, and appeared cooperative. (*Id.* at p. 903.) Two weeks later, however, patrolling officers reported that the witness had disappeared from the neighborhood where she lived. Despite that information,

his or her attendance by its process. [¶] (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

the prosecution made no attempt to contact the witness for almost six months. It was not until shortly before trial that the prosecutor's investigators finally visited the witness's former residence, only to be told that she no longer lived there. When an investigator received information two days before trial that the witness was living with her mother in San Bernardino, no action was taken for two days. (*Ibid.*) The investigator ultimately located the mother's address, traveled there, spoke to an unidentified woman, and left a subpoena for the witness. (*Id.* at p. 904.) No other efforts were made to locate the witness. (*Ibid.*)

■ After hearing the prosecution's evidence on due diligence, the trial court in *Cromer, supra,* 24 Cal.4th 889, allowed the witness's preliminary hearing testimony to be read to the jury. (*Id.* at p. 893.) In holding that the conviction must be reversed, the Supreme Court in *Cromer* observed that "the term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.] Relevant considerations include ' "whether the search was timely begun" ' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (*Id.* at p. 904.) What constitutes due diligence depends on the facts of each case. (*People v. Sanders* (1995) 11 Cal.4th 475, 523 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Defendant criticizes the prosecution for its initial delay in attempting to contact Singh, and questions the prosecution's followup efforts once it learned of Singh's status. According to defendant, the prosecution relied too heavily on Choi, who was not directly involved in Singh's Canadian asylum proceeding. In addition, defendant contends that the prosecution should have made more effort to contact and work with Singh's Canadian attorney because the attorney may have been able to obtain Singh's citizenship and passport documents from Canadian authorities.

Contrary to defendant's assertion, the facts concerning due diligence in this case do not resemble those at issue in *Cromer, supra,* 24 Cal.4th 889. Unlike in *Cromer,* there was no report shortly after Singh's preliminary hearing testimony that Singh had disappeared. Therefore, the prosecution had no reason to believe that Singh had left the jurisdiction or would be unavailable at trial, a fact that distinguishes this case from *Cromer.*

■ Ordinarily, "[t]he prosecution is not required 'to keep "periodic tabs" on every material witnesses in a criminal case . . . .' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing. [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 342 [30 Cal.Rptr.3d 513, 114 P.3d 758].)

It is speculative to maintain that if the initial contact with Singh had been sooner, the status of his United States visa might have been changed. As noted, this is not a case in which the prosecution had reason to believe shortly after the preliminary hearing that Singh's visa was about to expire, making his availability to testify at trial questionable. Instead, the record in this case is devoid of any indication that Singh would leave the jurisdiction after the preliminary hearing and prior to trial. To suggest, as defendant does, that the prosecution has an affirmative duty to verify a witness's immigration status and take affirmative steps with federal authorities to ensure that such status does not change between the preliminary hearing and trial, imposes too great a burden on the prosecution. (See *People v. Smith, supra*, 30 Cal.4th at p. 611 ["The prosecution must take reasonable steps to locate an absent witness, but need not do 'a futile act' "].)

Once the prosecution learned that Singh was in Canada, it used reasonable efforts to arrange for his appearance at trial. Prior to the first trial, the prosecution's investigators contacted the Federal Bureau of Investigation, the Department of Homeland Security, the Bureau of Immigration and Customs, the Canadian Consulate in Los Angeles, and Canadian immigration authorities in Canada. They also spoke directly with Singh in Canada and to his uncle, Sher Gill, in Los Angeles. Despite all of those efforts, they were unable to obtain his presence at the first trial.

After the mistrial in November 2005, Williams reconfirmed that Singh's status had not changed. Nevertheless, he wrote Singh a letter requesting that he appear at the second trial, offering to pay his travel expenses. Williams followed up that letter with at least two telephone calls to Singh whose late shift work schedule that made direct communication more difficult. Ultimately, Williams was able to speak with Singh by telephone on March 9, 2006, only to be informed that Singh's situation had not changed and that he could not travel to the United States because of the likelihood that he would not be allowed to return to Canada.

Although prosecution investigators apparently did not successfully contact Singh's Canadian attorney, it is speculative to conclude that successful contact with that attorney would have resulted in a material change in Singh's status. The investigators had already confirmed Singh's status through direct contact with him, as well as independently through the Canadian Consulate in Los Angeles and immigration authorities in Canada.

At oral argument, defendant maintained that this case is similar to, and therefore should be controlled by, the decision in *People v. Sandoval* (2001) 87 Cal.App.4th 1425 [105 Cal.Rptr.2d 504] (*Sandoval*). In that case, a witness then in custody on drug charges testified on behalf of the prosecution at the

preliminary hearing. (*Id.* at p. 1432.) In return for the witness's testimony, the drug charges against him were dropped, and he was thereafter deported to Mexico. (*Ibid.*) At the due diligence hearing to determine whether the witness's preliminary hearing testimony could be read at trial, the prosecution called two investigators who testified that the witness had been contacted in Mexico and had expressed a willingness to appear at trial to testify, but needed money to travel to Mexico City to apply for a passport and visa and to travel to the United States. (*Ibid.*) Although one of the investigators confirmed that the witness was required to appear personally at the American Consulate in Mexico City to apply for the visa and that the witness needed $100 to make that trip, the prosecution decided not to assist the witness in making the trip, and did nothing further to secure his attendance at trial. (*Ibid.*)

In holding that the trial court's finding of due diligence violated the defendant's constitutional right of confrontation under the Sixth Amendment, the court in *Sandoval, supra,* 87 Cal.App.4th 1425 observed that "[t]he circumstances presented to the prosecution, including finding [the witness], receiving from him his assurance he wanted to cooperate, and determining that he needed funds to comply, left the prosecution with several options. There was a possibility, not remote, even perhaps a likelihood, that [the witness] would attend if the prosecution assisted him. [Citation.]" (*Id.* at pp. 1441–1442.) According to the court in *Sandoval,* the prosecution had the burden of establishing unavailability, and it had failed to establish that providing financial assistance to the witness as requested would have been futile. (*Id.* at p. 1442.)

The facts in this case differ significantly from those in *Sandoval, supra,* 87 Cal.App.4th 1425. Here, after locating Singh, the prosecution made substantial efforts to obtain his presence at trial to testify, including processing the necessary paperwork with the appropriate federal agencies and contacting Canadian authorities as well. In addition, the prosecution made travel arrangements for Singh and confirmed for him in writing its willingness to pay his travel expenses, efforts the prosecution refused to undertake in *Sandoval.* Unlike the situation in *Sandoval, supra,* 87 Cal.App.4th 1425, the prosecution here did not have "several options" still available to obtain Singh's presence at trial when it ceased making efforts and sought instead to introduce Singh's preliminary hearing testimony. Nor was there a "likelihood" that Singh would attend if the prosecution assisted him; to the contrary, the evidence showed that notwithstanding the prosecution's offer of assistance, Singh refused to attend the trial based on the risk that he would not be allowed to return to Canada.

In an effort to illustrate the similarities he perceives between this case and *Sandoval, supra,* 87 Cal.App.4th 1425, defendant referred to the United

States "Treaty with Canada on Mutual Legal Assistance in Criminal Matters." (Treaty Between the Government of the United States of America and the Government of Canada on Mutual Legal Assistance in Criminal Matters, signed Mar. 18, 1985, entered into force Jan. 24, 1990, 100th Cong., 2d Sess., Treaty Doc. No. 100-14, reprinted in 24 I.L.M. 1092 (1985) (I.L.M.).) According to defendant, the treaty with Canada is similar to the one at issue in *Sandoval*, and as in *Sandoval*, the prosecution in this case made no effort to utilize that treaty to obtain Singh's presence at trial to testify.

The court in *Sandoval, supra*, 87 Cal.App.4th 1425 emphasized that there was a treaty between the United States and Mexico to provide mutual cooperation in legal matters, and criticized the prosecution in that case for not availing itself of the opportunities presented by that treaty to obtain the witness's presence. (*Id.* at pp. 1439–1440.) "The treaty also gave the prosecution means by which it may have obtained [the witness's] testimony at trial. The cooperation of Mexican authorities could have been invoked under article 9 to facilitate [the witness's] attendance, both by inviting him and by communicating to him the extent to which his expenses would be paid. While this article does not provide that the Mexican authorities will compel the attendance of the witness, it allows cooperation." (*Id.* at p. 1442.)

Contrary to defendant's assertion, the United States treaty with Canada upon which he relies does not deal with the situation that confronted the prosecution in this case. The provision of that treaty cited by defendant— article XV—is entitled "Transfer of Persons in Custody," (I.L.M., *supra,* at p. 1098) and, as that title suggests, the provision deals with persons *in custody* in the "Requested State," which in this case would be Canada. Singh was not in custody in Canada; he was living and working there while his request for asylum was being processed. Thus, that provision of the treaty would not have assisted the prosecution in this case. As Graham, the Canadian immigration official, informed the prosecution, there did not appear to be any special arrangements between the United States and Canada that covered Singh's particular circumstance.

Defendant also contends that Singh informed Williams on March 9, 2006, that his asylum application was scheduled for hearing, but that the prosecution did nothing to follow up concerning the results of that hearing. What defendant overlooks, however, is that Singh also told Williams that the date of the asylum hearing was March 16, 2006—the same date on which the prosecution was making its due diligence presentation to the trial court—and that he had no idea how long it would take to obtain a ruling or receive documentation from the Canadian authorities. There was no evidence presented to the trial court as to the time of the asylum hearing, its estimated length, or whether a ruling would issue forthwith or sometime in the future.

Consequently, on this record, the prosecution cannot be faulted for not knowing at the time of the March 16, 2006, due diligence hearing the results, if any, of Singh's asylum hearing in Canada *that same day.*

■ In contrast to the situation in *Sandoval, supra,* 87 Cal.App.4th 1425, the evidence in this case shows that the prosecution's efforts to obtain Singh's presence at the second trial were adequate, particularly in light of the prior efforts made and information received in attempting to obtain his presence at the first trial. Accordingly, the admission of Singh's preliminary hearing testimony did not violate defendant's constitutional rights.

C. *There Is Substantial Evidence in the Record to Support the Second Degree Murder Conviction*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

D. *The Trial Court Properly Instructed the Jury*

1. *Implied Malice: CALCRIM*[14] *No. 520*

■ Defendant was charged with and convicted of second degree murder, a crime that requires a finding of malice. (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) Malice may either be express or implied. (*Ibid.*) The trial court instructed the jury on, inter alia, the element of implied malice, using CALCRIM No. 520, which provided in pertinent part: "The defendant acted with implied malice if: [¶] 1. (He) intentionally committed an act; [¶] 2. The *natural consequences of the act* were dangerous to human life; [¶] 3. At the time (he) acted, (he) knew (his) act was dangerous to human life; [¶] AND [¶] 4. (He) deliberately acted with conscious disregard for (human) life." (Italics added.)

Defendant argues that the trial court had a sua sponte duty to instruct the jury on the "uncharged" or "target" offenses—presumably the "act"—upon which the prosecution was relying to establish the result and thereby in proving implied malice. According to defendant, the use of the term "natural consequences" in CALCRIM No. 520 and the prosecutor's use of the term "natural and probable consequences" during argument required the trial court under *People v. Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (*Prettyman*) to instruct the jury sua sponte about a target offense. Defendant argues that the trial court's failure to issue any instruction identifying and describing the target offense upon which the prosecution was relying is prejudicial error.

---

[*]See footnote, *ante,* page 314.
[14] Judicial Council of California Criminal Jury Instructions (2006–2007) (CALCRIM).

In *Prettyman, supra,* 14 Cal.4th 248, the court explained that "[i]t sometimes happens that an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense). Whether the accomplice may be held responsible for that nontarget offense turns not only upon a consideration of the general principles of accomplice liability . . . , but also upon a consideration of the 'natural and probable consequences' doctrine . . . ." (*Id.* at pp. 259–260.) Under that doctrine, "a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*Id.* at p. 261.) According to the court in *Prettyman,* "when the prosecution relies on the 'natural and probable consequences' doctrine to hold a defendant liable as an aider and abettor, the trial court must, *on its own initiative,* identify and describe for the jury any target offense allegedly aided and abetted . . . ." (*Id.* at p. 268.)

Defendant's argument based on the "natural consequences" language in CALCRIM No. 520 confuses two distinct concepts. As stated above, the sua sponte duty to instruct a jury to which defendant refers arises only when the prosecution relies on the "natural and probable consequences" doctrine in the context of aiding and abetting liability. (*Prettyman, supra,* 14 Cal.4th at pp. 268–270.) But this is not an aiding and abetting case. This is a murder case, not involving an accomplice, in which the rationale underlying the sua sponte instruction rule in *Prettyman* is not present.

The trial court in CALCRIM No. 520 instructed the jury, in part, that malice necessary for second degree murder can be implied when there is an intentional act, the "natural consequences" of which are dangerous to human life. Unlike a case based upon the "natural and probable consequences" theory of accomplice liability, set forth in *Prettyman, supra,* 14 Cal.4th at pages 260–263, the facts of this case did not require the jury to analyze two distinct transactions—a target crime, such as robbery, and a nontarget crime, such as murder—and determine whether a murder by a confederate was the natural and probable consequence of a robbery the defendant accomplice had agreed to aid and abet.[15] Here, defendant was charged with one count of second degree murder based upon a single transaction—the fight between defendant and the decedent in the parking lot of the convenience store. There was no unidentified target offense as there would be in an aiding and abetting

---

[15] The purpose of the rule in *Prettyman, supra,* 14 Cal.4th 248, is to ensure that the so-called target crime upon which the prosecution relies is identified and described for the jurors, so that they can then meaningfully evaluate whether the charged or nontarget crime committed by a defendant's confederate was a natural and probable consequence of that target crime. (*Id.* at p. 267 ["Instructions describing each step in this process ensure proper application by the jury of the 'natural and probable consequences' doctrine"].)

case in which the prosecution relies upon the natural and probable consequences of the act that the defendant allegedly aided and abetted. Thus, no duty to issue a sua sponte instruction identifying and describing a target offense arose in this case.

■ Contrary to defendant's suggestion, the use of the term "natural consequences" in the CALCRIM No. 520 definition of implied malice does not import into the crime of murder the case law relating to the distinct "natural and probable consequences" doctrine developed in the context of aiding and abetting liability. The sua sponte obligation discussed in *Prettyman, supra,* 14 Cal.4th 248 to give an instruction in an aiding and abetting case has no application to the facts of this case.

## 2. *Concurrence of Act and Intent: CALCRIM No. 252*

Defendant argues that the trial court committed prejudicial error when it gave a modified version of CALCRIM No. 252, which instruction the Supreme Court has referred to as a "concurrence instruction." (*People v. Rogers* (2006) 39 Cal.4th 826, 872–873 [48 Cal.Rptr.3d 1, 141 P.3d 135].) According to defendant, the trial court used the same "conscious disregard for human life" language to define both the implied malice necessary for murder and the general intent for voluntary manslaughter. Defendant contends that language "undoubtedly confused the jury by blurring the differences between the murder and voluntary manslaughter charges." Defendant further contends that the version of CALCRIM No. 252 given by the trial court went on to state that voluntary manslaughter required the specific intent to kill. That instruction, according to defendant, is an erroneous statement of the law that "further confused the jury by blurring the differences between murder and the lesser-included manslaughter charge."

The trial court gave the following modified version of CALCRIM No. 252. "Every crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] The following crime requires general criminal intent: voluntary manslaughter without the intent to kill *but with conscious disregard for human life.* To be guilty of (this) offense, a person must not only commit the prohibited act, but must do so intentionally or on purpose. It is not required, however, that the person intend to break the law. The act required is explained in the instruction for each crime. [¶] The following crimes require a specific intent or mental state: murder and voluntary manslaughter with the intent to kill. To be guilty of (these) offenses, a person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the intent or mental state required are explained in the instruction for each crime." The

trial court added the italicized language—"but with conscious disregard for human life"—to the quoted version of CALCRIM No. 252 by handwritten interlineation.

■ "California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice. [Citations.] [¶] Malice exists, if at all, only when an unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with awareness of the danger and a conscious disregard for life [citations]. [Fn. omitted.] In certain circumstances, however, a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill. In such a case, the homicide, though not murder, can be no less than voluntary manslaughter. [¶] On several recent occasions, we have explained the relationship between murder and manslaughter, as applied to intentional and unlawful killings. ' "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.]' " (*People v. Rios, supra*, 23 Cal.4th at p. 460.)

■ Although the court in *Rios, supra*, 23 Cal.4th 450, stated that voluntary manslaughter can be committed intentionally, it also recognized that specific intent to kill is not always a necessary element of that crime. (*Id.* at p. 461, fn. 7.) "[V]oluntary manslaughter . . . is *also* committed when one kills unlawfully, and with *conscious disregard for life*, but lacks malice because of provocation or imperfect self-defense." (*Ibid.*, citing *People v. Blakeley* (2000) 23 Cal.4th 82, 90–91 [96 Cal.Rptr.2d 451, 999 P.2d 675] & *People v. Lasko* (2000) 23 Cal.4th 101, 108–110 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

Based on the foregoing authorities, it appears that the second paragraph of the trial court's version of CALCRIM No. 252 correctly classified voluntary manslaughter as a general intent crime that could be based on "a conscious disregard for human life." Although the definition of implied malice for purposes of second degree murder in CALCRIM No. 520 also contained the phrase "conscious disregard for (human) life," the use of that phrase in both instructions did not render the trial court's concurrence instruction erroneous. Conscious disregard for human life is only one element of implied malice. The jury could not have believed that it could convict defendant of second degree murder solely because he acted in conscious disregard of human life. Rather, it was properly instructed that all of the elements of implied malice must be shown before a guilty verdict on the second degree murder charge

could be returned. These elements, as specified in the implied malice portion of the CALCRIM No. 520 instruction, included the requirements that the defendant must have intentionally committed the act, the natural consequences of the act were dangerous to human life, the defendant knew at the time he acted that his act was dangerous to human life, *and* the defendant deliberately acted with conscious disregard for human life.

In addition, the jury was properly instructed on the elements of voluntary manslaughter because the trial court gave CALCRIM Nos. 570 and 571, which define the heat of passion and imperfect self-defense forms of voluntary manslaughter. Both of those instructions provide that if the evidence satisfied the elements of either form of voluntary manslaughter, a killing that would otherwise be murder must be reduced to voluntary manslaughter. Thus, the trial court did not err by including the term "conscious disregard for human life" in the concurrence instruction, CALCRIM No. 252.

The third paragraph of CALCRIM No. 252,[16] the concurrence instruction (see *Rogers, supra,* 39 Cal.4th at pp. 872–873), which states that "voluntary manslaughter with the intent to kill" is a specific intent crime, is not as problematic as defendant contends, if it is read in the context of the entire concurrence instruction. As discussed above, voluntary manslaughter can be committed either with an intent to kill or with conscious disregard for human life—specific intent is not always a required element. Nevertheless, such specific intent can be present in the voluntary manslaughter context, as in the situation where the defendant intends to kill the victim, but does so while laboring under the honest but mistaken belief that the defendant is in danger of being killed or injured by the victim—imperfect self-defense. In such cases of imperfect self-defense, the specific intent to kill is present, but the requisite malice for murder is negated. Thus, the third paragraph of the concurrence instruction properly categorizes this latter form of voluntary manslaughter as a specific intent crime because, in such cases, the defendant intends to kill the victim.

Defendant seems to suggest that the third paragraph of the concurrence instruction, if read in isolation, implies that specific intent is *always* required to prove manslaughter, when that is not the case. The second paragraph of the instruction makes clear that specific intent is not always required to prove manslaughter. That paragraph does so by categorizing voluntary manslaughter without the intent to kill, but with conscious disregard for human life, as a

---

[16] The third paragraph of CALCRIM No. 252 reads: "The following crimes require a specific intent or mental state: murder and voluntary manslaughter with the intent to kill. To be guilty of (these) offenses, a person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the intent or mental state required are explained in the instruction for each crime."

general intent crime. As a result, when the instruction is read in its entirety, there is not the potential for confusion that defendant contends exists.

Even if the third paragraph of the trial court's concurrence instruction could have been construed as requiring the jury to find a specific intent to kill for the lesser included offense of voluntary manslaughter, any such failure to instruct the jury properly was not prejudicial error. "A majority of this court recently held that when a trial court violates state law by failing to properly instruct the jury on a lesser included offense, this test applies: '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 826 [299 P.2d 243]]. A conviction of the charged offense may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred (*Watson, supra*, 46 Cal.2d 818, 836).' (*People v. Breverman* [(1998)] 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)" (*People v. Lasko* (2000) 23 Cal.4th 101, 111 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

Here, as noted, the trial court properly instructed the jury on the elements of murder, including the elements of express and implied malice, and on the elements of voluntary manslaughter under both the theories of heat of passion and imperfect self-defense. Thus, the potential that the trial court's concurrence instruction, even if incorrect, caused confusion among the jurors about the differences between murder and voluntary manslaughter was minimal.

Moreover, in light of the evidence, it is unlikely that the jury would have returned a different verdict had the claimed instructional error not occurred. Defendant had expressed animus towards the store clerks, threatened them, returned to the store armed, provoked the second altercation, and stabbed the "defenseless" decedent even after defendant's companion tried to restrain him. Under these circumstances, there was ample evidentiary support for the guilty verdict on the second degree murder charge, such that it is not reasonably probable that defendant would have obtained a more favorable outcome had that challenged language not been used in the concurrence instruction. Thus, any error in the instruction was harmless error.

## DISPOSITION

The judgment of the trial court is affirmed.

Turner, P. J., and Kriegler, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 28, 2007, S156917.