Filed 3/27/15  P. v. Thomas CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICCO THOMAS,<br><br>    Defendant and Appellant. | B251904<br><br>(Los Angeles County<br>Super. Ct. No. BA397350) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Ricco Thomas appeals from the judgment entered following his conviction by jury of second degree murder (Pen. Code, § 187) with court findings he suffered two prior felony convictions (Pen. Code, § 667, subd. (d)) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)).  The court sentenced appellant to prison for 50 years to life.  We affirm.

## FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that in February 2012, Joseph Chavez was an inmate and trustee in the Los Angeles County Jail in downtown Los Angeles.  Albert Novshadyan, the decedent, was also an inmate.  Novshadyan learned Chavez no longer wanted to be a trustee.  Novshadyan asked Chavez if Novshadyan could have the job, and Chavez said yes.

On February 24, 2012, Samuel Bowser, another inmate, and Novshadyan were talking in Novshadyan's cell when appellant entered.  After appellant entered the cell, he and Novshadyan disagreed about who would be the trustee.  The two tussled and appellant grabbed Novshadyan around the neck.  Appellant punched Novshadyan, who was considered a weak person.  Appellant said Novshadyan owed him something.  Appellant took property belonging to Novshadyan that Novshadyan had bought at the jail canteen, and appellant left.  Someone persuaded appellant to return the items.  Appellant threw them into Novshadyan's cell but yelled to him it was not over.

An inmate named Nava told appellant, "I wish that was me you was doing that to." Nava went to his cell to remove excess clothing so he could fight, but deputies locked the cell doors for the night.  Nava yelled from his cell, "if that was me, you wouldn't do that to me."  Appellant replied, "[w]e'll handle this in the morning."  Appellant also said, "We're going to fight in the morning" and "I'm going to kill you tomorrow."  Appellant told Novshadyan, "You just got him killed" and "You're going to get him . . . killed just over this shit."  Donald Unmacht, an inmate, testified if appellant declined a challenge to fight, appellant would be considered a coward and inmates would prey upon him.

2

About 4:30 to 5:00 a.m. on February 25, 2012, deputies opened the cells. Nava and Novshadyan sat at a table. Appellant descended stairs, removing his shirt, and ran to the table where Nava and Novshadyan were sitting.

There was conflicting evidence concerning who started the ensuing fight. Chavez testified appellant immediately threw punches at Novshadyan, and appellant threw the first punch. Bowser testified appellant approached Nava, struck him first, and the two fought. Novshadyan hit appellant to defend Nava, and Novshadyan and appellant fought. Unmacht testified that after appellant sat at a table, Nava went to appellant and attacked him, and Novshadyan joined the fight. Unmacht later testified Nava unsuccessfully tried to strike appellant and appellant hit Nava first. Still later, Unmacht (his memory refreshed by the playing of a tape recording of his interview with detectives) testified he truthfully told detectives that appellant attacked Nava. Unmacht testified his memory was better when he talked to detectives than his memory was at time of trial. According to Chavez, when appellant began hitting Novshadyan, and Nava threw a few punches, Kevin Stokes (an inmate) pulled Nava away and said it was a one-man fight.

Unmacht testified appellant hit Novshadyan three or four times. Unmacht testified Novshadyan "was out" and fell on a table, and appellant dragged him. Appellant straddled Novshadyan, sat on his waist, and repeatedly hit Novshadyan. Novshadyan was defending himself, but eventually his arms dropped and he was no longer resisting appellant.

Appellant grabbed Novshadyan's head and repeatedly slammed it into the floor, and inmates heard Novshadyan's head crack loudly. Unmacht, Chavez, and Bowser saw this. Unmacht testified appellant stood over Novshadyan, "picked his head up, bashed it again and again, and his eyes just went distant, really distant. He just kept doing it like he wasn't even there." Appellant continued attacking Novshadyan. Unmacht saw appellant strike Novshadyan's head to the floor more than 20 times. Novshadyan was bleeding profusely from the back of his head.

Unmacht and other inmates told appellant to stop because he would kill Novshadyan. An inmate named Hollywood ran across the room and knocked appellant

3

off of Novshadyan. Appellant struck or kicked Hollywood, then stood and twice kicked Novshadyan in the head. Appellant later stood with his foot over Novshadyan's head when someone pushed appellant away. Appellant discarded two chess pieces including a bishop, the knob of which would extend past knuckles if held in the hand. Three days later, Novshadyan, who never regained consciousness, died as a result of his head injuries. An autopsy revealed the base of Novshadyan's skull was fractured. The fracture was consistent with his head repeatedly striking the floor.

2. *Defense Evidence.*

In defense, Stokes testified as follows. In February 2012, appellant was Stokes's cellmate. Cellmates supported each other. Stokes told appellant that Novshadyan owed Stokes some soups. Appellant said he would get them from Novshadyan, but Novshadyan ultimately did not give them to appellant. On February 24, 2012, appellant argued with Nava. Nava told appellant that Nava was going to "fuck [appellant] up the next morning."

On February 25, 2012, Stokes descended to the bottom of stairs and Nava punched him. Stokes pushed Nava and told Nava not to touch him. Nava walked away and sat down, as did appellant and Stokes. Later, appellant, with clenched fists, aggressively approached Nava. Nava punched appellant, and the two fought. Novshadyan joined the fight to assist Nava. Stokes pulled Nava away and began fighting him. About 45 seconds to a minute passed from the time Nava first punched appellant to the time security arrived.

Detectives interviewed Stokes several times. During one interview, Stokes told detectives, inter alia, the following. On the day of the altercation, appellant walked to Nava, punched him, and the two fought. The other guy, an Armenian, began fighting with appellant.

During another interview, Stokes told detectives the following. Appellant was a member of the Black P Stones. He was running the jail module and was pod trustee. Appellant "tax[ed]" people the night before the altercation. The night before the

4

altercation, appellant took soups from Argentine. Appellant told Stokes, "When I go out in the morning, I'm going to . . . whoop Nava's ass."

Haig Kojian, a psychologist, testified as follows concerning the acute stress response, also known as the fight-or-flight syndrome. The syndrome occurs during intense stress. During the syndrome, the autonomic, sympathetic nervous system helps the body produce sufficient energy to fight or flee. A released hormone maintains the energy. The frontal lobe of the brain is involved with planning, execution, and organization of thinking, and controls a person's judgment and decision making. During an acute stress situation, the frontal lobe is not activated.

3. *Rebuttal Evidence.*

In rebuttal, a deputy testified Stokes told him that Stokes saw a fight as he was descending stairs, the fight involved appellant, Nava, and Novshadyan, Stokes approached, and Nava punched him. Another deputy testified Stokes later told him Novshadyan and Nava ran to the table where appellant was seated and began hitting appellant.

## ISSUES

Appellant claims (1) the trial court erred by giving CALJIC No. 3.31, and (2) the trial court erroneously admitted evidence of appellant's gang membership.

## DISCUSSION

1. *The Trial Court Did Not Err by Giving CALJIC No. 3.31.*

a. *Pertinent Facts.*

The court, using CALJIC No. 3.31.5, instructed on the mental state of murder.[1] The court, using CALJIC No. 8.10, defined murder and, using CALJIC No. 8.11, defined

---

[1]    CALJIC No. 3.31.5 stated, "In the crime of MURDER, there must exist a union or joint operation of act or conduct *and a certain mental state* in the mind of the perpetrator. Unless this mental state exists the crime to which it relates is not committed. [¶]  The *mental state required is included in the definition of the crime set forth elsewhere* in these instructions." (Italics added.)

5

express malice and implied malice.[2]  Using CALJIC No. 5.17, the court instructed on imperfect self-defense as negating malice and precluding guilt for murder.

CALJIC No. 3.31 is the instruction challenged here.  As given by the trial court, CALJIC No. 3.31, entitled "CONCURRENCE OF ACT AND SPECIFIC INTENT," stated, "In the crime of VOLUNTARY MANSLAUGHTER which is a lesser included offense of the crime of MURDER, there must exist a union or joint operation of act or conduct *and a certain specific intent* in the mind of the perpetrator.  Unless this *specific intent* exists the crime to which it relates *is not committed*.  [¶]  The *specific intent required is included in the definition of the crime set forth elsewhere* in these instructions."

The court, using CALJIC No. 8.40, defined voluntary manslaughter.  That instruction stated, inter alia, "Every person who unlawfully *kills* another human being without malice aforethought but either with an intent to kill, or *with conscious disregard for human life*, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).  [¶]  There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.  [¶]  The phrase, 'conscious disregard for life,' as used in this instruction, means that a *killing* results from the doing of an intentional act, the natural consequences of which are dangerous to life, *which act was deliberately performed by a*

---

**2**     CALJIC No. 8.10 stated, inter alia, every person who unlawfully "*kills* a human being *with malice* aforethought, is guilty of the crime of murder" and, to prove that crime, one element that had to be proved was "The *killing* was done *with malice* aforethought." (Italics added.)  CALJIC No. 8.11 defined express malice and implied malice, and stated, inter alia, "Malice is implied when:  [¶]  1.  The killing resulted from an intentional act; [¶]  2.  The natural consequences of the act are dangerous to human life; and [¶]  3.  The *act was deliberately performed* with knowledge of the danger to, and *with conscious disregard for,* human life." (Italics added.)  The court also, using CALJIC No. 8.30, instructed on second degree murder stating, "Murder of the second degree is the unlawful *killing* of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." (Italics added.)  The court used CALJIC No. 8.31 to instruct on second degree murder based on implied malice.

*person* who knows that his or her conduct endangers the life of another and *who acts with conscious disregard for life*. [¶] In order to prove this crime, each of the following elements must be proved: [¶] . . . [¶] 3. The *perpetrator* of the *killing* either intended to kill the alleged victim, or *acted in conscious disregard for life*." (Italics added.)

The court, using CALJIC No. 8.75, instructed the jury "[v]oluntary manslaughter is [a] lesser [crime] to that of murder in the second degree." The court, using CALJIC No. 5.12, instructed on perfect (justifiable) self-defense and gave related instructions. Using CALJIC No. 1.01, the court instructed the jury to consider the instructions as a whole. We will present additional facts below where appropriate.

b. *Analysis.*

Appellant claims the trial court erred by giving CALJIC No. 3.31. He argues CALJIC No. 3.31 omitted any reference to the mental state of conscious disregard for life; therefore, the instruction erroneously failed to require a concurrence of act and conscious disregard for life before appellant could be guilty of voluntary manslaughter. He also argues the instruction erroneously indicated voluntary manslaughter based on conscious disregard for life is not a lesser included offense of murder.[3] We reject appellant's claim.

We note at the outset appellant's premise is that, unlike voluntary manslaughter based on intent to kill, voluntary manslaughter based on conscious disregard for life is not a specific intent crime. However, murder is a specific intent crime. (*People v. Alvarez* (1996) 14 Cal.4th 155, 220 (*Alvarez*), citing *People v. Whitfield* (1994) 7 Cal.4th 437, 450 (*Whitfield*)). *Whitfield* concluded this was true even if murder is based on implied malice. (*Whitfield*, at p. 450.)[4] As the instructions given in this case reflect,

---

[3] Appellant maintains, in contrast, CALJIC Nos. 3.31.5, 8.10, and 8.11, jointly read, adequately instructed murder requires a concurrence of act and malice (either express or implied).

[4] *Whitfield* stated, "Although it can be argued that implied malice does not constitute a specific intent as described in [*People v. Hood* (1969) 1 Cal.3d 444 (*Hood*)] because it does not involve an 'intent to do some further act or achieve some additional consequence,' it is quite clear that implied malice does not fit *Hood's* description of

7

voluntary manslaughter, like murder, may be based on a killing with *conscious disregard for life* (although a defendant who commits voluntary manslaughter lacks malice, unlike a murderer). Just as murder based on implied malice is a specific intent crime in light of the *presence* of the mental state of *conscious disregard for life* (leaving aside concepts of justification, excuse, and mitigation, even though murder requires the absence of these), we conclude voluntary manslaughter based on conscious disregard for life is a specific intent crime in light of the *presence* of the mental state of conscious disregard for life (leaving aside concepts of justification, excuse, and mitigation, even though voluntary manslaughter requires the absence of justification and excuse, and the presence of mitigation).[5] Notwithstanding appellant's concurrence and lesser-included offense arguments, we conclude the trial court did not err by giving CALJIC No. 3.31.

---

general intent, which is 'an intent merely to do a violent act.' [Citation.] Although implied malice may not fall literally within the *Hood* formulation of specific intent, the element of implied malice that requires that the defendant act *with knowledge of the danger to, and in conscious disregard of, human life, is closely akin* to *Hood's* definition of specific intent, which requires proof that the defendant acted with a specific and particularly culpable mental state." (*Whitfield, supra*, 7 Cal.4th at p. 450, italics added.) The fact malice implicates concepts of justification, excuse, and mitigation (because malice requires the absence of these) plays no part in the above statement.

[5]     We realize *People v. Martinez* (2007) 154 Cal.App.4th 314 (*Martinez*), cited by appellant, concluded voluntary manslaughter based on conscious disregard for life is a general intent crime. (*Id.* at pp. 317, 334-337.) However, *Martinez* reasoned voluntary manslaughter based on intent to kill involves specific intent *to kill* and is thus a specific intent crime; therefore, voluntary manslaughter based on conscious disregard for life was a general intent crime. (*Id.* at p. 335.) *Martinez* did not discuss whether voluntary manslaughter based on conscious disregard for life could be a *specific intent* crime even though the crime lacked specific intent *to kill*. Moreover, like the case with implied malice (see fn. 4, *ante*), it is quite clear conscious disregard for life for purposes of voluntary manslaughter does not fit *Hood's* description of general intent, i.e., an intent merely to do a violent act. Further, *Martinez* never discussed *Alvarez* or *Whitfield,* and *Martinez* ultimately concluded no prejudicial error occurred in that case.

8

Even if appellant's concurrence argument concerning CALJIC No. 3.31 were valid, it does not follow we must reverse the judgment. First, even if voluntary manslaughter based on conscious disregard for life is not a specific intent crime, we believe, based on our previous discussion, voluntary manslaughter based on conscious disregard for life is "closely akin" (*Whitfield, supra*, 7 Cal.4th at p. 450, italics added) to a specific intent crime with the result the trial court's failure to refer to conscious disregard for life in CALJIC No. 3.31 was not prejudicial.

Second, in *Alvarez*, in pertinent part, a jury convicted the defendant of first degree murder and other crimes. The trial court gave CALJIC No. 3.31 and indicated therein various specified crimes required a concurrence of act and specific intent, but the trial court omitted murder from the specified crimes (*Alvarez, supra,* 14 Cal.4th at pp. 175-176, 219); therefore, the instruction did not refer to said concurrence requirement as to murder.

*Alvarez* concluded the trial court erred by failing to include murder as one of the specified crimes in the instruction. (*Alvarez, supra,* 14 Cal.4th at p. 220.) However, *Alvarez* also concluded the error was to be evaluated under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Rogers* (2006) 39 Cal.4th 826, 875 (*Rogers*); *Alvarez*, at p. 220.) *Alvarez* further concluded there was no prejudice (*Alvarez,* at p. 220), relying, in pertinent part, on the fact "[a]n instruction on murder substantially covered the concurrence of act and 'specific intent.' " (*Ibid.*) *Alvarez* observed that, under said murder instruction, murder could be proven if the defendant " 'kill[ed] . . . *with* malice aforethought.' " (*Ibid.*)

In the present case, the crime of voluntary manslaughter was expressly specified in CALJIC No. 3.31 (unlike the murder omitted from CALJIC No. 3.31 in *Alvarez*). Moreover, similar to the case in *Alvarez*, other instructions given in the present case substantially covered the concurrence requirement. CALJIC No. 8.40 instructed the jury that every person who "kills . . . *with* conscious disregard for human life, is guilty of voluntary manslaughter." (Italics added.) CALJIC No. 8.40 also instructed conscious disregard for life, as used in that instruction, meant a "killing . . . which act was deliberately performed by a person . . . who acts *with* conscious disregard for life." (Italics added.) The instruction stated an element of voluntary manslaughter was, inter alia, "[t]he perpetrator of the killing . . . acted *in* conscious disregard for life." (Italics added.) The fact CALJIC No. 8.40 defined "conscious disregard for human life" "as used in [that] instruction" did not preclude the jury from considering "conscious disregard for life," as so defined, with CALJIC No. 3.31 as part of the jury's duty to consider instructions as a whole.

Third, even if CALJIC No. 3.31 did not require a concurrence of act and conscious disregard for life, this fact inured to appellant's benefit to the extent the instruction suggested the jury could acquit appellant of murder and convict him of voluntary manslaughter based on conscious disregard for life, even if the killing was not concurrent with conscious disregard for life. (See *Rogers, supra,* 39 Cal.4th at p. 875.)

Fourth, a concurrence argument, as pertinent here, asserts there was no *concurrence* of killing and conscious disregard for life, without disputing a killing occurred or the defendant harbored conscious disregard for life. If either a killing or conscious disregard for life is absent, there is no need to reach a concurrence issue. Appellant cites no evidence suggesting a lack of concurrence in this case. He argues there was evidence of a "reckless but unintended killing," but this is simply an argument there was evidence of a killing with conscious disregard for life, not an argument there was evidence of a *lack of concurrence* of killing and conscious disregard for life. The fact, if true, appellant actually believed he was in imminent danger for purposes of imperfect self-defense does not constitute evidence of lack of concurrence.

10

Fifth, in light of the evidence discussed in our Factual Summary, including the evidence (1) appellant made previous threats, and threats to kill, (2) appellant, the next day, repeatedly slammed Novshadyan's head to the floor, even when Novshadyan was no longer resisting and/or was unconscious, and (3) appellant thereafter repeatedly kicked him in the head, there was not only ample evidence appellant killed Novshadyan and ample evidence appellant harbored conscious disregard for life, but ample evidence of a concurrence of the killing and conscious disregard for life. It is not reasonably probable a different result would have occurred in this case absent the alleged instructional error pertaining to the concurrence issue. (Cf. *Martinez, supra,* 154 Cal.App.4th at p. 337.)

Sixth, the People argued to the jury appellant committed first degree, willful, deliberate, and premeditated murder and, if not, second degree implied malice murder. As to malice, appellant argued to the jury (in part because of Unmacht's testimony appellant's eyes "went distant" and the psychologist's testimony) that appellant lacked intent to kill and lacked a conscious disregard for life. Appellant also argued he killed in imperfect self-defense or, alternatively, in perfect self-defense. None of these arguments relied on any lack of *concurrence* of killing and conscious disregard for life, and appellant never argued to the jury any such lack of *concurrence.* Appellant never argued he killed, harbored conscious disregard for life, but there was no concurrence between the two. Imperfect self-defense and perfect self-defense seek to mitigate and justify, respectively, a defendant who kills *with* intent to kill or conscious disregard for life. (Indeed, to the extent appellant's defense at trial was he acted in perfect self-defense, that defense, if applicable, would have required acquittal. However, appellant concedes in his opening brief, "no jury was likely to view acquittal as a realistic option.")

Finally, the jury (which rendered its verdict in less than two hours and expressed no confusion about instructions) convicted appellant of murder based on express or implied malice, i.e., the jury necessarily concluded he, with malice, killed with intent to kill or killed *with* conscious disregard for life. It is therefore not reasonably likely that, absent the alleged instructional error, the jury would have concluded appellant committed

11

a voluntary manslaughter in which he killed, harbored conscious disregard for life, but killed *without* conscious disregard for life.

Similarly, as to appellant's lesser-offense argument, we acknowledge CALJIC No. 3.31 stated, "[u]nless this specific intent exists the crime to which it relates is not committed." However, first, as mentioned, conscious disregard for life is "closely akin" to (even if it is not the same as) specific intent. Second, CALJIC No. 8.40 defined voluntary manslaughter to include a killing based on conscious disregard for life, and CALJIC No. 8.75 instructed the jury voluntary manslaughter was a lesser crime of second degree murder. Third, our Factual Summary reveals ample evidence appellant killed *with intent to kill,* not merely with conscious disregard for life; therefore, it is not reasonably probable a different result would have occurred absent the alleged instructional error. (Cf. *Martinez*, *supra,* 154 Cal.App.4th at p. 337.) Finally, the jury by its verdict necessarily rejected any evidence (e.g., the distant look in appellant's eyes, and the psychologist's testimony) offered to negate malice by negating intent to kill or conscious disregard for life. It is not reasonably probable the jury would have reached a different result as to voluntary manslaughter. The trial court did not prejudicially err by giving CALJIC No. 3.31.

2. *The Trial Court Did Not Erroneously Admit Evidence of Appellant's Gang Membership.*

During the prosecutor's cross-examination of Stokes as he testified as a defense witness, appellant objected to the admission into evidence of that portion of a tape recording of Stokes's interview with detectives during which Stokes said appellant was a Black P Stones gang member. Appellant posed, in pertinent part, relevance and "inflammatory, 352" objections.

The court noted appellant had cross-examined witnesses concerning the jail environment in which the killing occurred, and concerning the facts violence occurred in jail, certain codes applied in jail, an inmate challenged to fight had to protect the inmate's reputation, and similar issues. The court concluded the gang membership evidence was highly relevant to the issues of self-defense, whether appellant believed his life was in

12

danger, whether appellant's conduct was reasonable, and how gang members were perceived, and reacted, in jail.  The court concluded the gang membership evidence was admissible and not unduly prejudicial.  As indicated in the Factual Summary, the court admitted evidence from Stokes that appellant was a Black P Stones member; that evidence was based on the tape recording.

Appellant claims the trial court abused its discretion by admitting the evidence appellant was a Black P Stones gang member.  We disagree.  Evidence of gang affiliation is admissible on the issue of malice aforethought, as against an Evidence Code section 352 objection.  (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518-1519.)  This implicates imperfect self-defense and perfect self-defense because a defendant who kills in imperfect self-defense or perfect self-defense lacks malice (and, in the case of perfect self-defense, commits no crime).

When ruling on an Evidence Code section 352 objection, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so.  All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under section 352.  (*People v. Williams* (1997) 16 Cal.4th 153, 213.)  The trial court did not abuse its discretion by overruling appellant's objections.

Moreover, even if the trial court erred by admitting evidence appellant was a Black P Stones gang member, the evidentiary reference to that fact was brief.  During jury argument, neither party referred to a gang or to appellant's gang affiliation.  There was ample evidence of appellant's guilt even absent the gang affiliation evidence.  Any error in the admission of that evidence was not prejudicial.  (Cf. *Watson, supra,* 46 Cal.2d 818, 836.)  Moreover, the application of the ordinary rules of evidence, as here, did not impermissibly infringe on appellant's rights to due process.  (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)  None of the cases cited by appellant compel a contrary conclusion.

*DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, Acting P. J.

We concur:


ALDRICH, J.


LAVIN, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.