Filed 5/20/15  P. v. Alvara CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B253959 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA093430) |
| v. | |
| CHRISTOPHER ALVARA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Arthur Jean, Jr., Judge.  Affirmed.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Alvara.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant Matthew John Miller.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Christopher Alvara (Alvara) appeals from his murder conviction, and Matthew John Miller (Miller), appeals from his murder and robbery convictions.[1] Miller and Alvara both contend: that jury instructions on aiding and abetting were misleading; that an aider and abettor cannot be convicted of second degree murder based on implied malice; that the trial court erred in failing to give a sua sponte instruction on involuntary manslaughter as a lesser included offense of murder; and that the trial court erred in refusing to order separate trials. In addition Miller contends that the trial court erred in failing to give a sua sponte instruction on theft as a lesser included offense of robbery. Alvara joins in Millers's arguments and both defendants contend that the cumulative effect of trial court errors requires reversal. As we conclude that all defendants' contentions lack merit, we affirm the judgments.

## BACKGROUND

**Procedural history**

In a two-count information, Alvara and Miller were charged in count 1 with the with murder of Mylon Waggoner (Waggoner), in violation of Penal Code section 187, subdivision (a),[2] and in count 2, with second degree robbery, in violation of section 211. The information also alleged as to count 1 that defendants committed the murder during the commission of a robbery within the meaning of section 190.2, subdivision (a)(17). As to both counts it was alleged that defendants committed the crimes for the benefit of, at the direction of, and in association with a criminal street gang with the intent to promote, further and assist the gang, within the meaning of section 186.22, subdivision (b)(1)(C).

The trial court denied Alvara's motion to sever his trial from Miller's and the defendants were jointly tried. A jury convicted both defendants of second degree murder, found not true the allegation that the murder was committed during the commission of a

---

[1]     We refer to Alvara and Miller collectively as defendants.

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

2

robbery, and acquitted Alvara of robbery, but convicted Miller of robbery as charged. The bifurcated gang allegations were stricken on motion of the prosecution.

On January 17, 2014, the trial court sentenced Alvara to 15 years to life in prison, with 487 days of presentence custody credit, and ordered him to pay mandatory fines and fees. The trial court sentenced Miller to a total prison term of 20 years to life, comprised of 15 years to life as to count 1, plus the upper term of five consecutive years in state prison for count 2, with 487 days of presentence custody credit, and he was also ordered to pay mandatory fines and fees. Defendants filed timely notices of appeal.

**Prosecution evidence[3]**

Waggoner lived on and off with Shari Baier and her husband. On April 4, 2011, when he decided to move to San Francisco, Bair drove him to the bus stop. Waggoner had a backpack containing among other things his iPod. He also had a suitcase, but needed some more of the belongings which he stored in the garage of a sober living home located on Webster Avenue and Cameron Street in Long Beach. Waggoner's friend Dennis Thomas (Thomas) managed the home and had allowed Waggoner to store some things there. Thomas had tried to get Waggoner accepted into the sober living program, but enrollment was limited to registered sex offenders, which Waggoner was not. Thomas was unable to give Waggoner access to the storage on April 4, 2011, so arranged to meet him the next morning. Waggoner told Thomas he would sleep nearby behind a tree on Webster Avenue.

Eduardo Lorenzo (Lorenzo) lived near the intersection of Wardlow Road and Webster Avenue in Long Beach, not far from Cameron Street. During the very early morning hours of April 5, 2011, he heard his dog barking loudly outside. He looked out a window and saw two men in the middle of the street. One man, later identified as Waggoner, was lying on the ground, trying to stand up. The other man walked past Lorenzo's house and toward Cameron Street, where Lorenzo saw a third man at the corner. When Waggoner walked to the bus bench, Lorenzo went outside to ask whether

---

**3**      Defendants did not testify or present evidence.

3

he was all right. Waggoner said he was okay and was just going to take a rest. Waggoner also said something like, "Those kids are crazy," and "Those kids jump on me."

Sometime between midnight and 1:00 a.m. that same night, Lorenzo's neighbor, Humberto Rodriguez Garcia (Rodriguez), heard dogs barking, peeked out his window, and saw a man running and shouting, "I want my backpack." Later that morning Rodriguez saw the man, later identified as Waggoner, lying down surrounded by police and other people. Rodriguez testified he had also seen Waggoner in the neighborhood at around 9:00 or 10:00 a.m. the previous morning carrying a briefcase and backpack.

Later in the morning of April 5, 2011, Waggoner was found dead, lying on the bus bench with his suitcase nearby. His backpack was never recovered. Waggoner died around 7:00 a.m. due to blood loss from multiple stab wounds. The medical examiner found 10 stab wounds in his chest and back, as well as defensive wounds to his right elbow, forearms, and hands, and abrasions on his scalp and knees. Though some of the stab wounds were not potentially fatal, those that were potentially fatal were not immediately fatal or incapacitating. The medical examiner opined that Waggoner could have remained on his feet for a while after being stabbed.

A cigarette butt was found near Waggoner's body and swabbed for DNA. Two DNA profiles were developed from the swabs. Waggoner was found to be the predominate contributor, while Miller was a possible minor contributor.

Miller and Alvara lived about two blocks from the crime scene. Homicide Detective Peter Lackovic suspected that defendants perpetrated this crime. Thus, when both defendants were in custody on an unrelated matter and before they were questioned or charged in this case, Detective Lackovic devised a plan to obtain information from them. He created a Criminal Information Bulletin about the murder with drawings of both defendants on it, posted it at the police station booking area and jail facility where defendants would see it, placed them separately in cells with an informant, and secretly recorded their conversations.

4

Portions of the jail cell recordings were played for the jury. Detective Hugo Cortes, Detective Lackovic's partner, explained some of the slang and Spanish words heard in the recordings, including the following: "chunking," which is slang for fighting; "fierro," meaning a sharpened metal object, such as a sharpened screwdriver, used to stab someone; "filero," a knife which is sharp on just one side; "jale," meaning a crime; "burner," a slang term for gun; and "strap," also a slang term for gun.

Miller discussed with the informant what he should tell his family. Miller said he did not know what to tell them, because they did not know anything about "that jale," and then, "Tell him we killed some [unintelligible]." The informant encouraged Miller to be honest with them and offered to call Miller's sister when he got out. Miller told him to tell his sister that Chris was talking to a detective, that they intended to interrogate her brother for a murder, and to bail out Chris.

Later in the conversation Miller said: "It was me and a couple homies. We see some nigger slipping in the hood . . . . He wasn't . . . he was like a child molester or something like that. I guess he got kicked out of one of those sober living homes." Miller continued: "Supposedly, I just walked up and 'hey G' [unintelligible] . . . . Fucking the homie just socked that nigger. This nigger jumped up and chunking, chunking with the homie. So I'm like 'Oh' and I picked up [unintelligible]"; "I pick up his suitcase [unintelligible]. That fool turned around. He starts swinging on me. I'm chunking it with this nigger. Boom, bam, boom, bam [unintelligible]"; "I don't know what happened, dog. . . . Like they were chunking the fool, next thing I know this nigger like he fell. [Unintelligible] what happened. Like I knocked him out. . . . Next day, heard that he died. [Unintelligible] that nigger ended up getting jumped. He got whacked. Whack, whack, whack, whack."

When the informant asked whether Miller thought he might have left fingerprints on the briefcase, Miller said, "No, see I got sliced, fool. When we were done chunking him, fool, I, I took off. I had a big ass slice on my finger, fool. . . . How'd I get sliced? Fucking like somebody stuck me too . . . ." Miller told the informant that "she knows about it." He explained that "she" had seen his finger, had seen the "vato, dead" and the

5

crime scene, but "she won't say shit." When the informant told Miller that he "just better hope they don't got that Fierro," Miller replied, "I know they don't [unintelligible]." After the informant said something unintelligible, Miller said, "And then my shit, my shit was he's stabbed, but I'm sliced." The two men then discussed whether the third man with them would "snitch," and Miller said: "He's like one of us dog [unintelligible] snitch on [unintelligible] fool. Trust me. I know him"; and "Just like I know Chris, fool. I know him." Miller told the informant that they "never took nothing. The suitcase was left there. The only thing we took was a backpack. Had a vodka bottle, and an iPod. That was about it, and we threw it away. We threw it in the dumpster." Later, the informant and Miller discussed "the flyer" and Miller noted it contained a section that "looks like . . . me and Chris."

In Alvara's conversation with the informant he was asked whether his homeboy was in jail too, and whether he was "running his mouth." Alvara said no, and added, "I mean hopefully not." The informant asked, "[W]as it a strap? Did you get rid of it? Was it a strap?" Alvara replied, "[Unintelligible] filero," and told him he had gotten rid of it. Asked where it happened, Alvara said that it happened one block from his "pad." Alvara said he knew that the man was a pedophile, because there was no middle or elementary school in his neighborhood. Asked something unintelligible, Alvara replied, "No, I was going to the store, and [unintelligible] laughing and drunk. Came back, you know. [Unintelligible] he was rushing the homie, so [unintelligible] beer, drinking and walking around [unintelligible]."

## DISCUSSION

### I. Aiding and abetting implied malice murder

Miller argues that because "the prosecution chose not to rely on a natural and probable consequences theory, [he] could only have been guilty of aiding and abetting murder if he specifically intended to encourage or facilitate a murder." He contends that one cannot aid and abet implied malice murder, and that the jury instructions given here erroneously allowed the jury to convict him in that manner. Alvara joins in the contentions and adopts Miller's arguments.

6

We first address defendants' premise that because no evidence directly placed a weapon in their hands, their liability was necessarily based upon a finding of aiding and abetting. Defendants cite *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165-1166, as authority for this assertion. Although the defendants in that case were charged as aiders and abettors because the shooter was unknown, the court did not hold that a defendant may only be convicted as an aider and abettor unless the evidence establishes that he wielded the murder weapon.

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Contrary to Miller's premise, "the dividing line between the actual perpetrator and the aider and abettor is often blurred. . . . When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator . . . . [For example] in a stabbing case, one person might restrain the victim while the other does the stabbing." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1121 (*McCoy*).)

Although Miller admitted he knocked the victim out before an accomplice stabbed him, thus disabling the victim as much as holding him down might have done, we assume for purposes of this discussion that he was convicted as an aider and abettor. We next address what appears to be Miller's confusion between the two theories of aiding and abetting, and begin by defining them. "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime.'" (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), quoting *McCoy, supra*, 25 Cal.4th at p. 1117.) This is known as direct aiding and abetting. (*Chiu, supra*, at p. 159.) "'Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and

abetted.'" [Citation.]" (*Ibid.*; see also *McCoy, supra*, at p. 1118.) The "inquiry is strictly objective and does not depend on defendant's subjective state of mind . . . . It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.]" (*Chiu*, at p. 166.)

Under the natural and probable consequences doctrine, the intended crime is also known as the "target" offense. (*Chiu, supra*, 59 Cal.4th at p. 161.) As Miller notes, the prosecutor did not proceed on the natural and probable consequences theory of aiding and abetting. It is only when the prosecution relies on the natural and probable consequences doctrine that the trial court is required to identify and define a target crime. (*People v. Martinez* (2007) 154 Cal.App.4th 314, 333.) Nevertheless (without citation to authority) Miller states: "A defendant cannot be liable as an aider and abettor unless he harbors the specific intent to help commit the target crime."

Miller has conflated the two theories by declaring that the target crime in this case was murder. Miller's reasoning, insofar as we follow it, appears to be that the corpus delicti of murder is a killing and murder requires an intent to kill; thus, the direct perpetrator's purpose is to kill; and because the aider or abettor must act with knowledge of the perpetrator's purpose, he must necessarily be found to have encouraged or facilitated murder. Miller concludes that "[b]ecause aiding and abetting murder requires a similar specific intent -- to encourage and facilitate a murder -- logic dictates that aiding and abetting the target crime of murder can only be based on express malice." Miller fails to connect his logic to the facts and theory of this case, and the authority on which he relies provides no such link. (See *People v. Swain* (1996) 12 Cal.4th 593, 604-607 [specific intent to kill is a required element of assault with intent to commit murder, attempted murder, solicitation for murder, and conspiracy to murder]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 606 [killing of accomplice by victim was a natural and probable consequence of target crime].)

8

The mental state required for implied malice murder is not an intent to kill. (*People v. Swain, supra*, 12 Cal.4th at p. 602.)  The mental state required for implied malice is knowledge that conduct endangers the life of another and a conscious disregard for life.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  Under the direct aiding and abetting theory, "an aider and abettor's mental state must be at least that required of the direct perpetrator.  'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.]'" (*McCoy, supra*, 25 Cal.4th at p. 1118.)  It follows that to aid and abet an implied malice murder, the direct aider and abettor must intentionally commit, encourage, or facilitate life-endangering conduct with knowledge of the perpetrator's purpose and conscious disregard for life.  (See *id*. at p. 1118 & fn. 1.)

Here, the trial court read CALJIC Nos. 8.11 and 8.31.  (See *People v. Knoller* (2007) 41 Cal.4th 139, 152.)[4]  The trial court also gave the jury the standard instructions on aiding and abetting, CALJIC Nos. 3.00 and 3.01.  Such instructions adequately informed the jury that the aider and abettor must have acted with knowledge of the perpetrator's unlawful purpose and with the intent or purpose of committing, encouraging, or facilitating the perpetrator's commission of the crime.  Miller admitted that he and two accomplices fought and killed Waggoner, that his own blows caused Waggoner to fall and possibly knocked him out, and that one of his accomplices then "whacked" Waggoner and stabbed him with a *fierro*, cutting Miller in the process.  We conclude from this evidence and the instructions given that the jury could appropriately

---

[4]    The trial court instructed as follows: "Murder of the second degree is also the unlawful killing of a human being when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life. When the killing is the direct result of such an intentional act it is not necessary to prove that the defendant intended that the act would result in the death of a human being. This is implied malice murder."

9

find Miller guilty of implied malice murder, either as a direct aider and abettor or "in part as the actual perpetrator *and* in part as the aider and abettor." (*McCoy, supra*, 25 Cal.4th at p. 1120.)

Alvara adopts Miller's arguments, although the evidence against him suggested that he did in fact wield the murder weapon. Alvara suggested to the informant that he had a motive to attack Waggoner, whom he believed was a pedophile, and he admitted that the murder weapon was a knife which he disposed of after the fight with Waggoner. As each defendant bears an individual burden to demonstrate error and prejudice, and Alvara has failed to provide a particularized argument in support of his claimed right to relief on this point, we have confined our discussion to Miller's arguments. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.) However, our rejection of the basic premise that an aider and abettor cannot be convicted of implied malice murder would in any event result in the rejection of Alvara's claim.

## II. Involuntary manslaughter instruction

Defendants contend that the trial court erred by failing to instruct the jury sua sponte regarding involuntary manslaughter as a lesser included offense of murder. In addition, Alvara asserts for the first time on appeal that the omission violated his constitutional rights to due process and jury trial; however, as we find no merit to defendants' contentions, we do not address the additional constitutional issues.[5]

Involuntary manslaughter is a killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192.) Involuntary manslaughter may be a lesser offense included within the offense of murder. (*People v. Abilez* (2007) 41 Cal.4th 472, 515.) "Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) "[T]he

---

[5] See *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17; *People v. Partida* (2005) 37 Cal.4th 428, 433-439.

10

'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

Defendants argue that because the evidence did not demonstrate which of the accomplices possessed the knife or perpetrated the stabbing, or that either defendant knew or intended that Waggoner would be stabbed, a reasonable jury could conclude that they committed no more than a misdemeanor battery. A misdemeanor assault or battery can be the predicate offense for a conviction of involuntary manslaughter, depending upon the circumstances. (*People v. Cox* (2000) 23 Cal.4th 665, 674-675.) However, defendants' battery upon Waggoner cannot simply be *deemed* a misdemeanor. "A battery is 'any willful and unlawful use of force or violence upon the person of another.' (§ 242.) A battery is deemed to be a felony unless specifically designated as a misdemeanor by either the prosecution or the court. [Citations.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 102-103.) There was no such designation here; and evidence of felony assault does not require sua sponte instruction on involuntary manslaughter. (See *People v. Bryant* (2013) 222 Cal.App.4th 1196, 1206.)

Moreover, not every misdemeanor assault or battery can be the predicate offense for a conviction of involuntary manslaughter. (*People v. Cox, supra*, 23 Cal.4th at pp. 674-675.) Involuntary manslaughter is an unintentional homicide committed with criminal negligence. (*People v. Penny* (1955) 44 Cal.2d 861, 879; *People v. Butler* (2010) 187 Cal.App.4th 998, 1012, 1015.) "'[C]riminal negligence [is] unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. [Citation.] If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. [Citation.]' [Citations.]" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1027.)

11

Defendants argue that the evidence did not show an intent to kill, because it was not proven which of the three accomplices held the knife. They also argue that the evidence did not show a conscious disregard for or indifference to human life, because there was evidence from which the jury could infer that they did not know Waggoner had been stabbed. Alvara points to evidence that he and his companions came upon Waggoner randomly; that Waggoner "rushed" one of them, said something to Miller, and a fight ensued; that Miller was surprised when he knocked Waggoner out; and that witnesses who saw or spoke to Waggoner afterward did not know he had been injured.

The evidence established that defendants participated in a group attack against a lone victim and beat him into unconsciousness as he attempted to fight back. This evidence alone shows an awareness of the risk, even if defendants came upon Waggoner randomly while returning from the store, attacked him only after he said something to one of them, attacked him only with fists, and Waggoner did not die immediately. The only evidence suggesting that a defendant did not fully appreciate the risk was Miller's surprise that Waggoner lost consciousness. To require a sua sponte involuntary manslaughter instruction, there must be substantial evidence, not "minimal or insubstantial" evidence, that the defendant acted without realizing that his conduct posed a risk to human life. (*People v. Evers* (1992) 10 Cal.App.4th 588, 596-597.) The evidence cited by defendants was insufficient to require the instruction.

Regardless, any error in failing to give the instruction was harmless. An erroneous failure to instruct on a lesser included offense requires reversal only if "an examination of 'the entire cause, including the evidence,' discloses that the error produced a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) This test is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)" (*People v. Breverman* (1998) 19 Cal.4th 142, 149.)

Here, the evidence of defendants' conscious disregard for the risk to Waggoner's life was overwhelming. Despite Alvara's claim that defendants just happened across Waggoner, their statements suggest they targeted Waggoner as a pedophile or child

12

molester and as an outsider in their neighborhood.  Miller said they saw "some nigger slipping in the hood" and thought he was a "child molester," and Alvara said he thought Waggoner was a "pedophile."  Miller said they "just walked up," and one of his companions "socked" Waggoner.  Although Miller did not know when Waggoner was "whacked," the stabbing clearly occurred during the time that defendants were beating him, as Miller left the scene with a cut finger.  Further, Miller knew that Waggoner was stabbed during the beating because he said that a companion had "stuck [him] *too*." (Italics added.)  Moreover, Waggoner suffered 10 stab wounds in the chest and back and multiple defensive wounds.  It is unlikely that a rational jury would have found that defendants were unaware that one of them or the third companion was stabbing Waggoner while defendants were beating Waggoner into unconsciousness, or that they did not realize the risk involved in beating a victim into unconsciousness while one of them or a companion repeatedly stabbed the victim.  Finally, defendants' immediate flight from the scene without summoning help implied a conscious disregard for life. (See *People v. Cravens* (2012) 53 Cal.4th 500, 511.)

We conclude it was not reasonably probable that defendants would have achieved a more favorable result had the trial court instructed with regard to involuntary manslaughter.  The omission was thus harmless.  (See *Watson, supra*, 46 Cal.2d at p. 836.)  Further, if we applied the federal constitutional test of *Chapman v. California* (1967) 386 U.S. 18, 24, we would conclude beyond a reasonable doubt that the omission of an involuntary manslaughter instruction did not contribute to the verdicts.

## III.  Theft instruction

Miller contends that the trial court erred in failing to give a sua sponte instruction on theft as a lesser included offense of robbery.

"'""Theft is a lesser included offense of robbery, which includes the additional element of force or fear."  [Citation.]  If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent.  [Citations.]'  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056 [to constitute robbery, intent to steal is must be formed before or during the application of force].)  'Nevertheless, "the existence

13

of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.]' [Citation.] 'Instructions on after-acquired intent and theft as a lesser included offense of robbery are unwarranted absent "substantial evidence" that the defendant first formed the intent to take the victim's property after applying force. [Citation.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1331.)

Miller first points to additional possible motives for the attack, such as Waggoner's "'talking back'"[6] or defendants' belief that Waggoner was a pedophile. Evidence of additional motives does not provide substantial evidence that the intent to steal was formed only after all force was applied. (*People v. Castaneda, supra*, 51 Cal.4th at pp. 1331-1332.) Miller next refers to several statements he made to the informant describing the incident as "a random thing," explaining that he picked up the suitcase early in the confrontation, right after his companion "crack[ed] that fool," and adding, "So I picked up the suitcase." He construes these statements as a denial that he intended to take any of Waggoner's property prior to assaulting Waggoner. Miller's statements included no such express denial; and even assuming that Miller did not intend to steal the suitcase at the outset of the attack, this does not provide substantial evidence that he did not form the intent to steal the backpack prior to the cessation of the assault.

Miller also notes that he never told the informant just when he and his companions formed the intent to take the backpack. Although an instruction might have been warranted if Miller had in fact told the informant when he and his accomplices formed the intent to steal the backpack (see, e.g., *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351), we reject any suggestion in Miller's argument that the absence of evidence can constitute substantial evidence.

Finally Miller points out that ultimately, only the backpack was taken and the suitcase and Waggoner's wallet were left behind. Leaving behind some items is not

---

**6** The pages of the transcript cited by Miller do not contain the words, "talking back," and we found no such quote or any indication that Waggoner said something rude.

14

substantial evidence that the intent to steal the item taken was not formed before or sometime during the assault. (See *People v. Hughes* (2002) 27 Cal.4th 287, 357.)

An incapacitating attack followed by theft gives rise to the reasonable inference that defendants intended to commit a robbery and that the intent to steal existed at the time of the attack. (See *People v. Holt* (1997) 15 Cal.4th 619, 670-671.) Thus, Miller's admission that he grabbed the suitcase at the outset of the confrontation, just after one of his companions struck Waggoner, strongly suggests that the three companions intended to disable Waggoner quickly in order to take his property. Defendant's relinquishment of the suitcase when Waggoner fought back was more likely intended to enable him to more effectively "chunk" Waggoner. Further, the theft of the backpack after an incapacitating attack upon Waggoner gave rise to the reasonable inference that defendants intended to steal it by means of force, and that their intent to steal was formed prior to the cessation of violence. As no substantial evidence supported a contrary inference, no sua sponte theft instruction was required. (*People v. Castaneda, supra*, 51 Cal.4th at p. 1331.)

Further, without substantial evidence that the intent to steal was formed at some time after the cessation of force rather than before or during the assault, Miller cannot demonstrate a reasonable probability that the instruction would have produced a more favorable result. We thus conclude that the omission was harmless under the test of *Watson, supra*, 46 Cal.2d at page 836.

## IV. Severance

The trial court denied defendants' motion to sever the trial of the two defendants and granted the prosecution's motion to admit their statements as nontestimonial hearsay declarations against penal interest, under Evidence Code section 1230. Defendants contend that the trial court erred in denying their motion for separate trials.

### A. *Aranda/Bruton*

Defendants contend that the trial court should have ordered separate trials because the recorded statements made to an informant violated the rule of *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). The *Bruton* rule provides that the Sixth Amendment confrontation clause generally precludes the admission of a statement or confession of a

nontestifying defendant when the admission or statement inculpates a jointly tried codefendant. (*Id*. at pp. 127-128; see also *People v. Aranda* (1965) 63 Cal.2d 518, 529 (*Aranda*).)

The confrontation clause applies only to testimonial hearsay. (*Crawford v. Washington* (2004) 541 U.S. 36, 51; *Davis v. Washington* (2006) 547 U.S. 813, 823-826 (*Davis*); *People v. Gonzales* (2012) 54 Cal.4th 1234, 1270.) Because the *Bruton* rule is premised on the confrontation clause it does not apply to nontestimonial statements. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571 (*Arceo*).) An inmate's surreptitiously recorded jailhouse conversation which does not involve law enforcement interrogation, is not testimonial. (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401-1402; see *Davis, supra*, at p. 825, citing *Bourjaily v. United States* (1987) 483 U.S. 171, 181-184 [statements unwittingly made to government informant], and *Dutton v. Evans* (1970) 400 U.S. 74, 87-89 [conversation between prisoners].) Thus, the *Bruton* rule has no application here, and the trial court did not err in denying the motion to sever on that ground.

Miller suggests that we disagree with *Arceo*, because neither the California Supreme Court nor the United States Supreme Court has held that the *Bruton* rule applies only to the testimonial hearsay statements of a codefendant. We reject the suggestion that we are bound by the absence of such a holding under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455. We agree with the reasoning of *Arceo* and also observe that federal appellate courts in several circuits have considered the issue and have held that *Bruton* applies only to testimonial hearsay. (*United States v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378-379; see, e.g., *United States v. Clark* (10th Cir. 2013) 717 F.3d 790, 816; *United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85; *United States v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326; *United States v. Vargas* (8th Cir. 2009) 570 F.3d 1004, 1009.)

### B. Declarations against interest

Defendants contend that the trial court erred in ruling that their statements qualified as declarations against penal interest as an exception to the hearsay rule (Evid.

Code, § 1230).**7**  Miller contends that three of Alvara's statements were not sufficiently incriminating to qualify as declarations against penal interest.  Alvara joins in Miller's arguments and adds that there were several statements by Miller that were not sufficiently incriminating to qualify as declarations against his penal interest.  Defendants conclude that because some of the statements were inadmissible hearsay, the trial court was required to grant the motion for separate trials.

"Our Legislature has expressed a strong preference for joint trials.  [Citations.]" (*People v. Souza* (2014) 54 Cal.4th 90, 109.)  Thus, two or more defendants jointly charged with the same crime must be tried jointly, unless the trial court, in its discretion, orders separate trials.  (§ 1098.)  The trial court may order separate trials when "'"there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants . . . ."'  [Citations.]" (*People v. Souza, supra*, at p. 109.)  Such a risk can arise when evidence to be offered is not admissible against all defendants.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1283-1284.)  In such a case, the defendant seeking severance bears the burden to clearly establish that a joint trial poses a substantial danger of prejudice; and even then, because of the preference for joint trials, the trial court may consider other means to avoid complete severance, such as separate juries.  (*Id*. at pp. 1286-1287.)

As respondent notes, the trial court's discretion must be reviewed on the basis of the facts known by the court at the time of its ruling on the motion for separate trials. (*People v. Avila* (2006) 38 Cal.4th 491, 575.)  The arguments made here were not before in the trial court at the time of the court's ruling.  Alvara's oral motion to sever or to

---

**7**  Evidence Code section 1230 provides an exception to the hearsay rule when the "declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, or . . . created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." Defendants were unavailable because they could not be compelled to testify.  (See *People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962.)

17

exclude Miller's statements was made on the ground of "due process."[8] The trial court found "due process" an insufficient ground and when defense counsel replied that he did not believe that Miller would testify, the court construed the objection as based upon the confrontation clause and the *Bruton* rule. Alvara's counsel then argued: "[Defendants] are talking independently to these two informants. *Greenberger*[9] allowed somewhat similar kind of information to be brought in. But it . . . was not hearsay because it was considered to be a declaration against the declarant's penal interest which not all of that is." The trial court indicated that it would rule once the prosecution provided transcripts of the statements. The prosecution then filed a motion to admit the statements, arguing that the confrontation clause was inapplicable because the statements were nontestimonial and admissible under the exception to the hearsay rule for declarations against penal interest. There was no argument regarding the inadmissibility under Evidence Code section 1230, of any particular parts of the conversations. The court reviewed the prosecution's motion and denied the defense motion for separate trials.

In sum, defendants moved for separate trials solely on the basis of the confrontation clause, not on the separate ground that the evidence or any particular passages failed to qualify as declarations against penal interest. In other words, neither defendant brought a motion to sever on the ground that evidence that was inadmissible as to one or the other defendants would present a substantial danger of prejudice in a joint trial for any reason other than interference with the right to cross-examination.

For the first time on appeal Miller contends that the trial court erred in denying the motion to sever for the additional reason that three passages in the informant's

---

[8]     Although Miller's counsel did not expressly join in the severance motion, the trial court treated the motion as brought by both defendants. Both defendants had previously brought an unsuccessful motion under section 1538.5 to suppress the jailhouse statements on the grounds that they had been unlawfully detained or arrested, and that the use of an informant violated their rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

[9]     See *People v. Greenberger* (1997) 58 Cal.App.4th 298, 331-332 [*Bruton* inapplicable to codefendant's statement admissible under hearsay exception for declarations against penal interest].

18

conversation with Alvara were inadmissible against him, as they did not qualify as Evidence Code section 1230 exceptions to the hearsay rule. In one passage, the informant asked whether Alvara's "homeboy" was there with him, and what he had been "busted for"; Alvara replied, "Same shit. He got caught with a [unintelligible]." In the second passage, Alvara answered, "Nah," when the informant asked, "Can you trust him? He's not running his mouth?" In the third, the informant asked Alvara whether there were witnesses who could identify him, and added, "As long as it's just you and your homeboy, that's it." Then, after the informant said something unintelligible, Alvara replied, "He's straight." Miller contends that although Alvara did not identify the homeboy accomplice, it is apparent he meant Miller. He further argues that the statements do not qualify as declarations against penal interest because they do not make Alvara appear more culpable than in other parts of his conversation and thus did not increase his liability.

Similarly, Alvara now contends that some of Miller's statements did not qualify as exceptions to the hearsay rule. He does not quote or paraphrase them, but simply refers to a list of citations to 15 pages with line numbers in the transcript of the recording of Miller's conversation with the informant, without directing his argument to any particular passage. We reject Alvara's arguments as insufficiently developed. (See *People v. Williams* (1997) 16 Cal.4th 153, 206.)

In determining whether a statement qualifies for admission as a declaration against penal interest, the trial court should examine each challenged statement in context. (*People v. Valdez* (2012) 55 Cal.4th 82, 144.) "'The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]' [Citation.]" (*People v. Arauz, supra*, 210 Cal.App.4th at p. 1400, quoting *People v. Greenberger, supra*, 58 Cal.App.4th at p. 334.) Nevertheless, Miller did not identify for the trial court the passages he now challenges, did not make the argument he now makes, and did not discuss the totality of the circumstances or any circumstances regarding the conversation.

19

A trial court does not err "in failing to conduct an analysis it was not asked to conduct." (*People v. Partida, supra*, 37 Cal.4th at p. 435.)

Moreover, we agree with respondent that the three statements cited by Miller, when viewed in the context of the entire conversation, were sufficiently incriminating to qualify as declarations against Alvara's penal interest. Alvara acknowledged his participation in the crime when he said he had been "busted" for the "same shit" as his "homeboy"; and he acknowledged disposing of the "filero" or knife that was used to commit the crime. Further, we agree that the statements regarding whether Alvara could trust his accomplice and whether his accomplice was "running his mouth" were, "an integral part of the statement in which he implicated himself." (*Greenberger, supra*, 58 Cal.App.4th at p. 340.)

In sum, defendants have failed to demonstrate that the denial of the motion to sever was an abuse of discretion. Thus, to be entitled to reversal, defendants must demonstrate that "in the end, the joinder of . . . defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 851.) To demonstrate prejudice, defendants begin with the presumption that the statements challenged here for the first time would have been excluded in separate trials. Miller argues that if Alvara's statements had been excluded, the jury might have believed his counsel's argument that Miller's comments were merely false bragging. Alvara contends that without Miller's statements his own admissions probably would not have been enough for the jury to convict him. As defendants have not shown that the statements would have been excluded in separate trials, their arguments do not demonstrate the unfairness of a joint trial. Reversal is unwarranted.

## V. Cumulative error

Defendants contend that the cumulative effect of all the errors heretofore discussed was to deny them a fair trial. "As we have found no substantial error in any respect, this claim must be rejected." (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

20

**DISPOSITION**

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

21