Filed 10/5/23  P. v. Ottley CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WILLIAM OTTLEY and MAURICE WILLIAMS, <br><br> Defendants and Appellants. | B320336 <br> (Los Angeles County <br>  Super. Ct. No. BA391952) |

APPEAL from judgments of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant William Ottley.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Maurice Williams.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants and appellants William Patrick Ottley (Ottley) and Maurice Miguel Williams (Williams)[1] in 2012 of first degree murder.  This court affirmed the judgment of conviction in 2015.  (*People v. Crosby, et al.* (Jan. 27, 2015, B251779) [nonpub. opn.].)  In 2019, Ottley filed a petition for resentencing under former Penal Code section 1170.95 (now section 1172.6),[2] which permits persons convicted of murder under the natural and probable consequences doctrine to petition the sentencing court to vacate their convictions and resentence them.  (§ 1172.6, subd. (a).)  Williams filed his resentencing petition in 2020.  On April 28, 2022, the trial court denied both petitions after conducting a joint evidentiary hearing.

In arguing for reversal of the orders denying their resentencing petitions, appellants contend:  (1) they were improperly convicted of murder based on the natural and probable consequences doctrine because the prosecutor argued that theory of culpability to the jury during their 2012 trial; (2) they were improperly convicted of imputed-malice murder based on the gang experts' testimony during the 2012 trial; (3) the trial court improperly relied on imputed malice as a basis for denying appellants' resentencing petitions; and (4) the trial court erred by not suppressing at the petition hearing evidence obtained during a warrantless search of Williams' cell phone incident to his 2010 arrest for robbery and admitted without objection during appellants' 2012 trial.  Appellants claim the cell phone evidence is not "admissible under current law" within the meaning of section

---

[1]     Ottley and Williams are referred to collectively as appellants.

[2]     Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no significant change in text.  (Stats. 2022, ch. 58, § 10.) We will refer to the section by its new numbering only.  All further statutory references are to the Penal Code.

1172.6, subdivision (d)(3)[3] because the United States Supreme Court, in *Riley v. California* (2014) 573 U.S. 373 (*Riley*), held that a warrant is required to search a cell phone seized incident to an arrest, abrogating previous California law on that issue. (*Id.* at pp. 401–402, abrogating *People v. Diaz* (2011) 51 Cal.4th 84 (*People v. Diaz*).) Appellants further contend the trial court's erroneous consideration of the purportedly inadmissible evidence was prejudicial and requires reversal of the orders denying their petitions.

We affirm the trial court's orders. The record shows that appellants were not convicted under the natural and probable consequences doctrine or of imputed-malice murder. Denial of appellants' request to suppress evidence is not a ground for reversal because appellants fail to establish any prejudice from the admission of that evidence.

## FACTUAL BACKGROUND[4]

*The Robbery*

At 11 p.m. on June 4, 2010, Williams and two other males approached Walter Yates, pointed a gun at him, and ordered him to hand over "all [his] stuff." The assailants took Yates' belongings, including a computer, and fled. Police recovered the computer when a woman tried to sell it back to Yates.

---

[3]     The statutory language on which appellants rely states: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)

[4]     The relevant facts are taken from the reporter's transcript of appellants' 2012 trial.

3

*The Murder*

At 2:30 a.m. on June 13, 2010, appellants and Demetrius Crosby were seated in Williams' Chevrolet Camaro, parked outside an apartment building in Los Angeles. Marlon Usher was seated in the backseat of Loralyn Aguilar's car, parked nearby. Usher was intoxicated and arguing with Aguilar while refusing to leave the car. Usher yelled, "Mind your [own] business" to one of the three men in the Camaro. That man looked at Usher in an unfriendly manner and gestured toward Aguilar's car while talking to the other occupants of the Camaro.

Aguilar began to drive away, with Usher still seated in the back seat. The Camaro followed and then overtook Aguilar's car and blocked it from proceeding further. Williams, the driver of the Camaro, exited the car and walked toward Aguilar's vehicle. Usher exited Aguilar's car and walked toward the side of the road. Williams' two companions exited the Camaro and ran toward Usher. The passenger who exited from the Camaro's back seat was carrying a revolver. Aguilar was afraid. She reversed her car, made a U-turn, and returned to the apartment building. When Aguilar reached the apartment building, she heard gunshots. As she called 911, Aguilar heard a second set of gunshots.

Several witnesses in the area heard someone pleading, "Please don't shoot me. Don't do this to me. Don't do me this way." A voice responded, "Not this time, Blood." A series of gunshots followed, and another voice said, "Let's go." A car then drove away rapidly.

The police arrived soon thereafter and found Usher lying in the street. He had four gunshot wounds, one to the head and the others through his back. Usher died from the multiple gunshot wounds.

4

On June 13, 2010, Williams reported to police that his 1995 Chevrolet Camaro had been stolen sometime between 9 p.m. on June 11 and 8 p.m. on June 12, 2010. In his police report, Williams identified Ottley as his nearest relative and provided Ottley's address.

Williams was arrested on June 4, 2010 for the Yates robbery. After Williams' arrest, Summer Bonner, who identified herself as Williams' girlfriend, contacted Detective David Vinton and asked for the keys to Williams' car. Incident to Williams' arrest, Detective Vinton searched Williams' cell phone and found photographs of Williams' Camaro and photographs and texts indicating Williams was a gang member. The photographs and texts on Williams' phone prompted Detective Vinton to contact the South Homicide Bureau to inquire whether any murders had occurred over the weekend involving a gray or green Camaro. Detective Linda Heitzman, who was investigating Usher's murder, contacted Detective Vinton, who informed her of Summer Bonner's identity and relationship with Williams. Detective Heitzman went to Bonner's residence, where she found Williams' Camaro concealed under a tarp.

Four witnesses identified Williams' Camaro as the one they had seen on the night of the murder. A forensic examination revealed Ottley's fingerprints and DNA inside the Camaro. Cell phone data analysis showed Williams' and Ottley's phones near the crime scene at the time of the murder and departing thereafter from that location.

**PROCEDURAL BACKGROUND**

*Relevant Trial Proceedings*

Appellants and their codefendant Crosby were tried together. During the trial, the jury heard recordings of phone calls intercepted between Crosby

and a woman named Diamond, implicating Crosby as the person who shot Usher. A gang expert testified at trial that Ottley and Crosby were both self-admitted members of the Five Deuce Broadway Crips gang, and Williams was a self-admitted member of the Rollin 20's gang of Long Beach. Based on a hypothetical reflecting the circumstances of the murder, the expert opined the crime was committed for the benefit of the gangs because gang members were compelled to retaliate against disrespectful behavior to maintain stature in the community. The expert further opined gang members would gain respect as a result of the killing.

The trial court denied the prosecutor's request for a jury instruction on the natural and probable consequences doctrine, finding insufficient evidence of any "target" crime other than murder, and instructed the jury on aiding and abetting as the sole theory of appellants' culpability. The trial court also instructed the jury on express and implied malice pursuant to CALJIC No. 8.11,[5] second degree murder (CALJIC No. 8.30), and manslaughter (CALJIC Nos. 8.37, 8.42, and 8.43). The trial court further instructed that in case of

---

[5] The jury was instructed on express and implied malice as follows: "'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] The word 'aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

6

uncertainty, whether murder was of the first or second degree, the jury was to find second degree murder. (CALJIC 8.71).

On August 17, 2012, the jury found appellants and Crosby guilty of first degree premeditated murder (§ 187, subd. (a)) and Williams guilty of second degree robbery. (§ 211.) The jury further found a principal personally and intentionally discharged a firearm during the murder (§ 12022.53, subds. (b), (d), (e)), and the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

The trial court found Williams had two prior "strikes," or serious felony convictions, and sentenced him to 75 years to life (50 years to life on the murder count, plus 25 years to life on the robbery count). The court sentenced Ottley to 50 years to life (25 years to life on the murder count plus 25 years to life for the firearm enhancement).

*Petition Proceedings*

Ottley filed a petition for resentencing on March 15, 2019, and Williams filed his resentencing petition on April 16, 2020. The trial court issued an order to show cause as to both petitions and conducted a joint evidentiary hearing. At the hearing, the court denied Williams' request to suppress evidence from his cell phone that had been admitted into evidence without objection at the 2012 trial.

In separate written rulings filed on April 28, 2022, the trial court denied appellants' petitions, finding the jury had not convicted appellants under the felony murder, imputed malice, or natural and probable consequences doctrines. The court further found the record established beyond a reasonable doubt that appellants would be convicted of aiding and abetting first degree murder.

7

This appeal followed.

## DISCUSSION

I. *Resentencing Under Section 1172.6*

The Legislature enacted Senate Bill No. 1437 (SB 1437), which became effective on January 1, 2019, "to amend the felony murder rule and the natural and probable consequences doctrine,[6] as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  SB 1437 amended section 188, which defines malice, and section 189, which defines the degrees of murder, to address felony-murder liability.  Section 188 now requires, when the felony-murder rule does not apply, that a principal in the crime of murder "shall act with malice aforethought" and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)  With one exception not applicable here,[7] SB 1437 effectively eliminated murder convictions premised on a theory of imputed malice—that is, any theory by which a person can be convicted of murder for a killing committed by someone else, such as felony murder or the natural and probable consequences doctrine—unless the

---

[6]     Under the natural and probable consequences doctrine, an aider and abettor of criminal conduct is guilty of not only the intended crime, but also "'"for any other offense that was a 'natural and probable consequence' of the crime aided and abetted."'" (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*).)

[7]     That exception is set forth in section 189, subdivision (f), which applies to the killing of a police officer.

prosecutor also proves that the nonkiller defendant personally acted with the intent to kill or was a major participant who acted with reckless disregard to human life.  (§§ 188, subd. (a)(3) & 189, subd. (e).)

SB 1437 also added section 1172.6, providing a procedure by which defendants whose cases are final can seek retroactive relief by petitioning the sentencing court to vacate the conviction and resentence on any remaining counts.  (§ 1172.6, subd. (a).)  The statute permits persons convicted of felony murder or murder under a natural and probable consequences theory to petition for relief.  (Stats. 2018, ch. 1015, § 4, subd. (a).)  Effective January 1, 2022, the Legislature expanded the scope of the petitioning procedure to allow persons convicted of attempted murder under the natural and probable consequences doctrine also to petition for relief.  (Stats. 2021, ch. 551, § 2; § 1172.6, subd. (a); *People v. Saibu* (2022) 81 Cal.App.5th 709, 747.)

If a petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an order to show cause.  (§ 1172.6, subd. (c).)  If the trial court determines the petitioner has made a prima facie showing for relief and issues an order to show cause, the court must hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence."  (§ 1172.6, subd. (d)(1).)  At the hearing, the parties may rely on the record of conviction or present "new or additional evidence" to support their positions, and "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended."  (§ 1172.6, subd. (d)(3).)

II. *Aider and Abettor Culpability for Murder*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*Gentile, supra,* 10 Cal.5th at p. 843.) Such derivative liability results from an act by the perpetrator to which the aider and abettor contributed. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 (*Beeman*).) "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) As to the mens rea element, the defendant must not only know the direct perpetrator's intent, they must share that intent. (*Beeman, supra,* 35 Cal.3d at p. 560.)

Aiding and abetting may be shown by circumstantial evidence. It is well-settled that a defendant's presence at the scene of the crime and failure to prevent it, companionship, and conduct before and after the offense, including flight, are relevant to determining whether the defendant aided and abetted in the commission of the crime. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

10

First degree murder, as defined in section 189, includes any willful, deliberate, and premeditated killing. (§ 189, subd. (a).) Murder requires malice aforethought, which can be express or implied. (*Gentile, supra,* 10 Cal.5th at p. 844.) Malice is express when there is a manifest intent to kill. (§ 188, subd. (a)(1).) Express malice is shown when the assailant either desires the death or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Smith* (2005) 37 Cal.4th 733, 739.) Malice is implied when someone kills with "no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) Implied malice murder requires knowledge that conduct endangers the life of another and a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

SB 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.'" (*People v. Offley* (2020) 48 Cal.App.5th 588, 595–596.) "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Id.* at p. 596.) For a defendant to be liable for first degree murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra*, 59 Cal.4th at p. 167.)

"[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) This is because "the

11

dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor." (*Id*. at p. 1120.)

III.  *Appellants Were Not Convicted Under the Natural and Probable Consequences Doctrine*

Although the jury was not instructed on the natural and probable consequences doctrine at their 2012 trial, appellants nevertheless contend they were improperly convicted under that theory because the prosecutor argued the natural and probable consequences doctrine to the jury. They cite several statements by the prosecutor during closing argument and rebuttal.

For example, during closing argument, the prosecutor told the jury: "There are two types of malice aforethought. There is something we call express malice and something we call implied malice. Express malice is easy. It's when you pull out a gun and pull the trigger and you are pointing it at a human five times. That shows you are clearly trying to kill the person. [¶] Implied malice is when the killing resulted from an intentional act, in this case helping Mr. Crosby, and this applies to Mr. Ottley and Mr. Williams, and the natural consequences of the act are dangerous to human life. [¶] What were they planning on doing? What was *the natural and probable consequence* here? Remember what Detective Franson told you when he testified about gang members. He said—and it's hard to understand. It's hard to understand because none of you are gang members, but you have to consider this." (Italics added.)

Appellants focus on the prosecutor's reference to the "natural and probable consequences" of appellants' conduct. It is evident however, from the context of the prosecutor's statements, that he was referring to the theory

12

of implied malice as set forth in CALJIC No. 8.11 when a killing results from an intentional act, and the "natural consequences" of the act are dangerous to human life, and not the natural and probable consequences doctrine. As the trial court noted in its written ruling, "[t]he doctrine of natural consequences is a sanctioned legal precept entirely different from—and not to be confused with—the doctrine of natural and probable consequences." Use of the term "natural consequences" in the definition of implied malice "does not import into the crime of murder the case law relating to the distinct 'natural and probable consequences' doctrine developed in the context of aiding and abetting liability." (*People v. Martinez* (2007) 154 Cal.App.4th 314, 334 (*Martinez*).)

Appellants also cite the following statements by the prosecutor during rebuttal: "When Mr. Ottley decided to go join this confrontation, get out of the car and run up, what do you think he was thinking in his head? I submit there is only one reasonable interpretation. He is thinking: I am going to help. That is aiding and abetting when you decide to help. [¶] When you do acts and conduct like open the door and get out of the car and run towards the victim who is unarmed and by himself, then you are aiding and abetting that crime, and that in itself here, ladies and gentlemen, that instruction on implied malice covers what is natural—the natural consequences. The *target offense* here, what he knew was going to happen, was a *violent confrontation* because they had been disrespected, the natural consequence of which is dangerous to human life." (Italics added.)

Appellants again focus on specific words in isolation, in this case, "target offense," as the basis for contending the prosecutor argued the natural

and probable consequences doctrine to the jury.[8] Viewed in context, it is evident the prosecutor was explaining the doctrine of implied malice to the jury, not the natural and probable consequences doctrine. "Unlike a case based upon the 'natural and probable consequences' theory of accomplice liability, . . . the facts of this case did not require the jury to analyze two distinct transactions—a target crime, such as robbery, and a nontarget crime, such as murder—and determine whether a murder by a confederate was the natural and probable consequence of a robbery the defendant accomplice had agreed to aid and abet." (*Martinez, supra,* 154 Cal.App.4th at p. 333.) Appellants here were charged with and convicted of first degree premeditated murder based upon a single transaction—the shooting of Usher. The trial court did not err by concluding there was no target offense as there would be in a case based upon the natural and probable consequences doctrine.

Finally, appellants cite the following statements during the prosecutor's rebuttal argument: "As far as Mr. Williams and Mr. Ottley are concerned, as far as implied malice is concerned for the two of them, I don't have to prove that they intended to pull the trigger. I don't have to put the gun in their hand. I don't have to show fingerprints. I don't have to show DNA. *I have to show they were down to participate in a violent contributive act* for being disrespected and not even individually. Just as a group they were disrespected and they all decided let's go discipline this fool." (Italics added.)

---

[8] Under the natural and probable consequences doctrine, an aider and abettor "'is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the crime.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

We reject appellants' argument that the prosecutor's use of the terms "violent confrontation" and "violent contributive act" "were thinly veiled references to an assault that could naturally and probably result in a murder." The context in which the prosecutor used those terms makes clear he was discussing implied malice and not the natural and probable consequences doctrine.

Contrary to appellants' claim, the trial court did not rely solely on the jury instructions and the verdict convicting them of first degree murder as the bases for concluding "it [was] not possible" for the jurors to have convicted them without finding appellants acted with the requisite intent to kill. The trial court's written ruling lists in detail the evidence supporting that conclusion—the shooting occurred seconds after appellants intercepted Aguilar's vehicle; there was no evidence of a fight or beating preceding the shooting; Usher begged for his life before he was summarily executed. Substantial evidence supports the trial court's determination that appellants were properly convicted as aiders and abettors of first degree premeditated murder, and not as accomplices under the natural and probable consequences doctrine.

IV. *Appellants Were Not Convicted of Imputed-Malice Murder*

We reject appellants' claim they were convicted of murder based on imputed malice as the result of the prosecution's gang expert testimony. As appellants note, gang experts testified at the trial that gang members must respond to acts of disrespect, must support fellow gang members by committing crimes to benefit the gang, and gain respect by participating in acts of violence on behalf of the gang. Appellants' claim that the prosecutor used gang expert testimony to persuade the jury that appellants, as gang

15

members, shared the same knowledge and intent to shoot Usher, however, is unsupported by the record. The selected portions of the prosecutor's argument cited by appellants do not concern imputed malice. The prosecutor's statements, read in context, concern accomplice culpability based on express and implied malice. The prosecutor argued, for example, that Ottley's decision to exit the Camaro and assist Williams was an intentional act to join in what he knew would be a violent confrontation, given appellants' gang affiliation and gang culture. The prosecutor also argued, in the context of explaining principal culpability pursuant to CALJIC No. 3.00, that appellants aided and abetted Crosby's shooting of Usher by intercepting and blocking Aguilar's car and by running out of the Camaro to assist Crosby. Accordingly, appellants' guilt as aider and abettors was based on "the combined acts of all of the participants as well as [each] person's own mental state."

The trial court did not, as appellants claim, rely on imputed malice to find they were guilty of murder. There is ample evidence in the record, independent of gang expert testimony, that appellants shared Crosby's intent to kill Usher. Appellants knew Crosby had a gun when he exited the Camaro. Their combined presence prevented Usher from fleeing. Appellants were present when Usher pleaded for his life; they did not intervene; instead, someone responded, "Not this time, Blood" and Crosby shot Usher multiple times. Appellants and Crosby then fled from the crime scene together. Substantial evidence supports the trial court's conclusion that appellants were guilty as aiders and abettors of murder. (See *People v. Lara, supra,* 9 Cal.App.5th at p. 322; *People v. Campbell, supra,* 25 Cal.App.4th at p. 409.)

None of the gang experts opined on appellants' specific intent concerning the crime. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1049

[emphasizing the "critical difference between an expert expressing an opinion in response to a hypothetical question and the expert expressing an opinion about the defendants themselves"].) The gang evidence, moreover, was both relevant and admissible to bolster other evidence concerning appellants' culpability as aiders and abettors of murder. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 [expert's testimony concerning gang culture and rivalries, together with the defendant's presence and conduct at the time of shooting, bolstered evidence of the defendant's involvement in the crime].) The trial court did not rely on imputed malice in finding appellants culpable for Usher's murder.[9]

## V. *Denial of Request to Suppress Evidence Harmless Error*

The trial court's denial of appellants' request to suppress evidence is not a ground for reversal. The evidence appellants sought to suppress was information obtained from Williams' cell phone during a warrantless search incident to his 2010 arrest and trial testimony concerning the cell phone information. Their evidentiary challenge is based on the following language in section 1172.6, subdivision (d)(3): "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is

_____

[9] On September 1, 2023, Ottley filed a notice of new authority in which he advised this court of a recent decision, *People v. Reyes* (2023) 14 Cal.5th 981, that he claimed was relevant to the issues on appeal. That case is inapposite, as defendants were not convicted under the natural and probable consequences doctrine or of imputed-malice murder. The record does not support Ottley's claim that the trial court in the petition proceedings relied on imputed malice to find defendants guilty of murder, based solely or principally on gang expert testimony at the 2012 trial.

17

admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)[10] Appellants claim that section 1172.6, subdivision (d)(3)'s limitation on evidence a petition court may consider to evidence "that is admissible under current law" bars admission of the cell phone evidence because in 2014 the United States Supreme Court held in *Riley* that law enforcement officers must obtain a warrant before searching a cell phone seized incident to an arrest, abrogating previous California law on that issue. (*Riley, supra,* 573 U.S. at pp. 401–402.) Appellants further contend the trial court's reliance on inadmissible evidence when denying their petitions requires reversal of the trial court's orders.

---

[10] Subdivision (d)(3) of section 1172.6 states in its entirety: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."

18

Appellants fail to establish prejudice resulting from any allegedly erroneous admission of evidence; accordingly, denial of the motion to suppress, even if error, was harmless.  The harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836, applies to the erroneous admission of evidence in a section 1172.6 hearing.  (*People v. Myles* (2021) 69 Cal.App.5th 688, 706.)  Under that standard, appellants bore the burden of showing a reasonable probability they would have received a more favorable result had the error not occurred.  (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447.)  Although appellants are permitted to join in the arguments in each other's briefs, they each individually must show prejudice resulting from any trial court error.  (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 12, fn. 2.)

Williams fails to establish prejudice from admission of cell phone evidence concerning his gang affiliation.  There is ample evidence in the record, independent of texts and photographs on Williams' cell phone, that he was a self-admitted member of the Rollin Crips 20 gang.

Ottley similarly fails to sustain his burden of establishing prejudice. He claims Williams' cell phone information led the police to Summer Bonner's residence, where they found the Camaro containing Ottley's fingerprints and DNA.  Absent this evidence, Ottley maintains, he would not be implicated in the murder, and the prosecution would have been unable to establish he was not entitled to relief under section 1172.6.  Ottley ignores other evidence, independent of the cell phone information, leading to the discovery of Williams' Camaro, linking Ottley to Williams, and implicating Ottley in the murder.  Williams' girlfriend, Summer Bonner, asked the police shortly after Williams' arrest to give her Williams' car keys, even though Williams had previously reported the car stolen.  Police subsequently found

19

Williams' Camaro at Bonner's residence. Intercepted telephone conversations obtained from Crosby's cell phone implicated Ottley in the murder and indicated that Crosby suspected Ottley of "snitching" to the police about the murder. Data obtained from Ottley's own cell phone showed he was present near the crime scene at the time of the murder. There was ample evidence, independent of his DNA and fingerprints in the Camaro, of Ottley's participation in the murder.

Because we conclude any purported error was harmless, we need not consider whether the denial of appellants' motion to suppress was grounds for reversal.

## DISPOSITION

The orders denying appellants' petitions for recall of sentence and resentencing under section 1172.6 are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, J.

WE CONCUR:


CURREY, P. J.


COLLINS, J.

20